******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* REGINALD DAMONE
(AC 34248)

Robinson, Sheldon and Harper, Js.*

*Argued October 10, 2013—officially released February 11, 2014*

(Appeal from Superior Court, judicial district of
Middlesex, Handy, J.)

*Richard E. Condon, Jr.*, senior assistant public defender, for the appellant (acquittee).

*Timothy F. Costello*, assistant state's attorney, with whom, on the brief, were *Peter A. McShane*, state's attorney, and *Russell C. Zentner*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The acquittee, Reginald Damone, who has been committed to the jurisdiction of the Psychiatric Security Review Board (board) since July 1, 1985, following his acquittal by reason of mental disease or defect on two counts of sexual assault in the first degree with a deadly weapon, two counts of kidnapping in the first degree and one count of attempt to commit sexual assault in the first degree, appeals from the order of the trial court granting the state's petition, pursuant to General Statutes § 17a-593 (c), to continue his commitment for a period of up to two years beyond the expiration of his original maximum term on the ground that he remains a person with psychiatric disabilities whose discharge would constitute a danger to himself or others. The acquittee claims that the court erred in granting the petition because the state did not prove by clear and convincing evidence, under controlling legal standards, that he had a current mental illness that caused him to pose a risk of imminent physical injury to himself or others. We disagree with the acquittee's claim, and, thus, affirm the court's order extending his commitment by a period of two years.

On October 11, 1984, following a jury trial on charges of two counts of sexual assault in the first degree with a deadly weapon under General Statutes (Rev. to 1983) § 53a-70a and two counts of kidnapping in the first degree under General Statutes § 53a-92 (a) (2) involving attacks on two different women, and one count of attempt to commit sexual assault in the first degree under General Statutes §§ 53a-49 and 53a-70 involving a third woman,[1] the acquittee was acquitted of all charges by reason of mental disease or defect under General Statutes § 53a-13. As a result of this verdict, the acquittee was committed to the custody of the Commissioner of Mental Health on February 7, 1985, for a maximum term of twenty-five years. Thereafter, on July 1, 1985, he was committed to the jurisdiction of the board for the balance of his twenty-five year term, which was set to expire on February 6, 2010.

On August 26, 2009, the state timely filed a petition for continued commitment, which it amended on August 31, 2009. Pursuant to § 17a-593 (d), the board responded to the petition by filing a report dated November 24, 2009, in which it recommended that the court grant the petition, and thereby order the continuation of the acquittee's commitment for a period of two years beyond its original maximum term. On December 21, 2011, after conducting a two day hearing on the petition, the court, *Handy, J.*, delivered an oral decision from the bench, granting the petition and ordering the continuation of the acquittee's commitment for an additional period not to exceed two years beyond its original maximum term. This appeal followed.

## I

UNDERLYING FACTS AND PROCEDURAL HISTORY

The following facts, as developed in the record before the court, are relevant to our resolution of the acquittee's claims. A series of three violent incidents in September, 1983, led to the acquittee's arrest on charges of two counts of sexual assault in the first degree with a deadly weapon, two counts of kidnapping in the first degree, and one count of attempt to commit sexual assault in the first degree. The background of mental illness against which the acquittee took part in those violent incidents began long before September, 1983. When the acquittee was a child, his mother and his father inflicted physical and psychological abuse upon him. He witnessed his father physically abuse his mother and also saw his mother raped by two men. Between the ages of six and thirteen, the acquittee's uncle sexually molested him by fondling his genitals, penetrating him anally, and forcing him to perform oral sex. The acquittee's baby-sitter " 'taught [him] how to have intercourse' " when he was eleven years old. At age twelve, the acquittee was gang raped by a group of boys. He slept in the same bed as his mother until he was fourteen and was friendless in high school.

As early as age five or six, the acquittee felt anger toward women and fantasized about sexually assaulting them. Later in childhood, he experienced command hallucinations and reported thoughts of cats entering his body and mind and taking control of him. As a teenager, the acquittee dated passive, vulnerable women, whom he threatened and assaulted. At age nineteen, during the six months that he was in the United States Army, he committed his first rape and numerous sexual assaults for which he was never arrested. The acquittee also physically and sexually assaulted his wife, both before and during their marriage. His assaults on his wife involved bondage, beatings, threats, intimidation, degradation, and sexual attacks.

In 1981, the acquittee intentionally drove his car into a telephone pole in a suicide attempt. The acquittee and his wife separated in 1982 because she feared for her life. She fled from their home in South Carolina to her brother's home in Connecticut for safety. In February, 1982, the acquittee was hospitalized for eleven days due to complaints of severe depression, marital issues, and fears that he might injure his wife.

In 1983, the acquittee moved to Connecticut in an attempt to reconcile with his wife. At that time, the acquittee received outpatient treatment for symptoms of depression, delusions, and labile mood. By the spring of 1983, the acquittee's longtime use of intoxicants, which had begun with alcohol and marijuana at age fifteen, progressed to psilocybin mushrooms, a hallucinogen, which he ingested on three occasions in 1983.

He also became obsessed with the idea of raping women and experienced command hallucinations to do so from cats and snakes, which he believed to live inside him. His delusions caused him to believe, at the time of the incidents which led to his arrest, that if he raped six men and six women, he would inject the snakes into them and be rid of them.

After his arrest, while incarcerated at the Hartford Community Correctional Center, the acquittee displayed psychotic behavior, eating his own feces and believing that a baby Smurf and a snake were living in his stomach and feeding on him. He also started to believe that he was becoming a snake, and so he shaved his face, eyebrows, and eyelashes in an effort to resemble a snake more closely. On February 23, 1984, having given notice of his intent to rely upon the defense of mental disease or defect, the acquittee was transferred to the Whiting Forensic Institute at Connecticut Valley Hospital (CVH) for examination and treatment while awaiting the start of trial.

After his posttrial commitment to the custody of the board on July 1, 1985, the acquittee was carefully supervised and monitored for a period of twenty-four years. Initially, the acquittee was supervised at a maximum security psychiatric hospital, but, later, was transferred to less restrictive psychiatric facilities. He was granted several temporary leaves to receive sex offender treatment, drug abuse counseling and other services. Eventually, the acquittee was monitored in the community on conditional release. The general trend throughout the term of the acquittee's commitment was one of steady, closely monitored progress, during which it was generally agreed by the acquittee's treatment providers that his mental disease was in remission and that he was achieving success in understanding his illness, dealing with people and handling the pressures of his increasing freedom and new responsibilities. Ultimately, however, there came a time, near the end of the initial term of his commitment, when the acquittee violated several requirements of his conditional release and was rehospitalized. Although he resumed making progress following his rehospitalization, including no longer being required to take psychiatric medication, certain of his treatment providers believed that he was not yet ready to be discharged from the board's jurisdiction because, in their judgment, he still suffered from a mental disease from which he would be at imminent risk of harm to himself or others if he were released from their care, custody, and supervision. As a result of this determination, which was shared with the state's attorney, the state's attorney petitioned the court for an extension of the acquittee's maximum term of commitment to the board.

A

The Acquittee's History Under the Board's Supervision

The evidence before the court, as reflected in its decision on the petition, documented the following relevant aspects of the acquittee's treatment, supervision, and conduct while committed to the jurisdiction of the board.

In its first postcommitment memorandum of decision, dated September 13, 1993, following a hearing to consider the acquittee's possible transfer from a maximum security psychiatric hospital to a less restrictive psychiatric hospital setting, the board found that, at that time, the acquittee "suffers from a mental illness, Major Depression, with Psychotic Features; Organic Deficit, and a history of drug abuse." The board concluded that the acquittee "continues to require psychiatric treatment to address the issues that render him a danger to others and for his own personal growth and development," and "recommend[s] that he should be in individual psychotherapy on a long term basis with skilled clinicians." The board noted that the acquittee "has made significant progress in his treatment at Whiting Forensic Institute in addressing various issues and gaining insight into both his mental illness and his behavior," and "has reached a level of clinical stability based on his response to medication, therapeutic intervention and his display of appropriate behavior." The board's ultimate finding was that the acquittee "remains a person who should be confined, that he is mentally ill to the extent that his discharge or conditional release would constitute a danger to himself or others . . . [but that he] can be safely treated and supervised in a psychiatric hospital providing less than maximum security." Accordingly, it ordered that he be transferred to Norwich Hospital for the purposes of care, custody, and treatment.

On September 13, 1999, following a hearing to consider an application by CVH for the acquittee to be given temporary leave to receive sex offender treatment, the board found that the acquittee "remains mentally ill and continues to require inpatient treatment and supervision. . . . [The acquittee] has benefited from sex offender treatment, continues to need that treatment and could have a very limited temporary leave to participate in that treatment without one-to-one supervision and not pose a risk to the community. . . . [The acquittee] is a person who should be confined . . . [and] he has a psychiatric disability to the extent that his discharge or conditional release would constitute a danger to himself or others." The board granted CVH's application for temporary leave, permitting the acquittee to be transported to The Connection, Inc., by CVH staff for sex offender treatment for up to two and one-half hours, once per week.

On January 5, 2001, the board granted CVH's application for temporary leave to permit the acquittee to attend mental health and substance abuse treatment

activities at Reliance House in Norwich for up to eight hours per day, up to three days per week, while under the general supervision of CVH staff. In its memorandum of decision, the board found that the acquittee "is clinically stable, cooperative with treatment and responsibly uses his current temporary leave privileges. . . . [T]he application would further his treatment while not posing a danger to the community."

On July 16, 2004, the board conducted a hearing to consider CVH's application for a two phase temporary leave plan. Phase one included increasing the acquittee's ongoing day treatment activities from three to five days per week and beginning overnight stays at a community residency program for up to three nights per week. Phase two included increasing his overnight stays to up to seven nights per week and causing him to begin a search for competitive employment. The board found that the acquittee "remains mentally ill and continues to require care, custody and treatment for that mental illness, and without such he would constitute a danger to himself or others. [The acquittee] has remained clinically stable and compliant with all aspects of his treatment in the hospital and in the community while on temporary leave. [The acquittee] has progressed in his treatment such that he has gained significant insight into his mental illness and his need for treatment and supervision, and he has developed relapse prevention plans to minimize the risk he would pose in the community." The board concluded that the acquittee "is a person who should remain confined; he has a psychiatric disability to the extent that his discharge or conditional release would constitute a danger to himself or others." The board granted CVH's two phase application for temporary relief and, on November 22, 2004, approved his movement to phase two of his temporary leave.

On November 15, 2005, following a hearing on CVH's application for full conditional release, the board found that the acquittee "continues to have a psychiatric disability that requires treatment, monitoring and supervision but he can be adequately and safely managed in the community on conditional release. [The acquittee] has remained clinically stable and compliant with all treatment in the hospital and in the community while on Temporary Leave. He has been able to maintain appropriate relationships and continues to work in sexual offender therapy to develop skills to form healthy relationships and adhere to a relapse prevention plan. [The acquittee] can be conditionally released to the community without constituting a danger to himself or others under the conditions contained within this order."[2]

On March 13, 2007, following a hearing to consider an application for modification of conditional release filed by the Southeastern Mental Health Authority

(SMHA), the board granted the application and found the following: "[The acquittee] has a psychiatric disability that requires treatment, supervision and monitoring which can be adequately provided in the community on Conditional Release. [The acquittee] has made a good adjustment to community living, has complied with all treatment recommendations and conditions of his release. He did have some difficulty in his residential setting in regards to communication issues, but was able to process this with his treatment providers and resolve any issues. He has been able to retain and maintain employment. He began a relationship with a former coworker, disclosed his legal status and crime to her and has followed recommendations from his treaters regarding the relationship." The board restricted the acquittee's contact with the former coworker with whom he had begun a relationship by ensuring that SMHA supervise his physical and telephone contact with her and by prohibiting all contact with her minor children.

On August 14, 2007, following a hearing on an application for modification of conditional release filed by the SMHA seeking to move the acquittee to an independent apartment setting, to have him self-administer medication, and to decrease the frequency of his vocational counseling, the board granted the application upon finding as follows: "[The acquittee] has remained clinically stable and compliant with his treatment. He has utilized his supports appropriately. He has demonstrated the ability to function independently and has been a constructive and helpful member of his residential community. He has shown that he has the skill level to function safely in an independent apartment with residential support from the Reliance House Transitional Apartment Program. He has demonstrated compliance with medication and understands his need for medication. He has been able to secure and maintain employment with minimal need for vocational services." The board also included in its memorandum of decision the fact that following its March 13, 2007 order, The Connection, Inc., developed a plan to allow the acquittee to have increased contact with his former coworker and permit him to have contact with her daughters in public places. The acquittee, however, ended his relationship with the coworker by the time of the August 14, 2007 memorandum of decision.

On February 4, 2008, the board considered and granted an application for the acquittee, who was employed by McDonald's, to attend a managers meeting at the Mohegan Sun Conference Center, located on casino grounds, finding that the acquittee "has remained compliant with community treatment. He would not constitute a danger to himself or others if allowed to travel on casino grounds for a job related purpose with his probation officer."

On May 21, 2008, following a hearing to consider an application for modification of conditional release to decrease the acquittee's individual therapy sessions from weekly to twice per month, to reduce his supervision by the Office of Adult Probation from three times per month to two times per month, and to increase the weekly number of hours the acquittee could work to fifty hours per week, the board granted the application upon finding as follows: "[The acquittee] has remained clinically stable and compliant with all aspects of his Conditional Release Order. He continues to demonstrate progress relative to his treatment and recovery. He has maintained an independent apartment and employment. Further, he continues to evidence insight into his psychiatric illness, need for treatment and understanding of his psychiatric medication. Allowing changes to his current community placement order would not increase his risk to himself or the community."

The acquittee's long history of progress in coping with his mental illness while under the board's supervision suffered a series of setbacks beginning in 2008, which ultimately led to his rehospitalization. The acquittee's problems began on October 16, 2008, when his probation officer, Daniel Marsh, called his home telephone and cell phone after his 11 p.m. curfew but received no answer. The acquittee attempted to call Marsh back and left him voice mail messages. At midnight, Marsh called the acquittee's home telephone and he answered. The next day, the acquittee explained to psychologist Mark A. Gould, his conditional release supervisor, that he was awakened by Marsh's telephone call, went outside to smoke a cigarette, and then returned Marsh's call from his cell phone.

On October 28, 2008, Marsh conducted a home visit at the acquittee's apartment at about 10:15 p.m., before the acquittee's curfew of 11 p.m., and found that the acquittee was not at home. Marsh left his business card on the acquittee's door, instructing him to call when he returned home. When the acquittee returned home, he claimed not to have seen Marsh's card, which he speculated had fallen off the door. When Gould confronted the acquittee about these missed curfews, the acquittee became argumentative, accusatory, and angry.

Two months later, in January, 2009, the acquittee breached the restrictions on accessing the Internet set forth in the conditions of release appended to and made a part of the board's November 15, 2005 decision authorizing his conditional release. In particular, he violated the requirement that he obtain prior approval for and notify his treatment providers of his relationships with women. A polygraph examination administered to the acquittee revealed that he had viewed Internet pornography, had spoken to former prostitutes, and had had

sexually explicit telephone calls with women. He also had created basic Facebook[3] and Gmail[4] accounts that did not include photographs or personal information about himself. In this same time frame, moreover, the acquittee admittedly met a prostitute at a soup kitchen and gave her money to purchase cigarettes. He reported that he had been interested in pursuing a sexual relationship with her, but not as a prostitute. With regard to the sexually explicit telephone calls, the acquittee explained that he had met two women on the bus with whom he later had several telephone conversations, but denied ever having phone sex. He ended his contact with one of the two women after he discovered that she had a boyfriend. He ended his contact with the second woman because he suspected that she was a drug addict and concluded that involving himself with her would not be a " 'good situation' . . . ."

In light of the acquittee's recent backsliding, the board determined, at a hearing held on March 17, 2009, that his conditions of release should be modified to restrict his Internet access and forbid him from communicating with former prostitutes. Also on that date, the board rejected a proposal that the frequency of the acquittee's visits with his psychiatrist be reduced, concluding that the acquittee "has a psychiatric disability that requires treatment, supervision and monitoring that can be adequately provided in the community under the terms of Conditional Release. Although [the acquittee] has made progress in the community by living independently, [self-administering] medications and obtaining and maintaining competitive employment, [the acquittee] recently failed to disclose activities that potentially could impact his risk, requiring interventions including therapeutic contacts. Given these recent events, decreasing interactions with his psychiatrist is not supported. Under the conditions of this order, however, [the acquittee] would not constitute a danger to himself or others while on Conditional Release. . . . [The acquittee] has a psychiatric disability to the extent that his final discharge would constitute a danger to himself or others, but can be adequately treated and supervised in the community."

Over the next several months, the acquittee was granted and successfully completed a series of minor modifications of his conditional release to allow him limited access to the Internet and e-mail for employment purposes,[5] and to enable him to travel out of state to visit his dying mother, then to attend her funeral.[6] In light of his success in handling these new responsibilities, a further modification of his conditions of release was approved by the board on October 15, 2009, to decrease the level of supervision and monitoring by his conditional release supervisor. The board based this modification on findings that the acquittee "has remained clinically stable and in compliance with all conditions. He is currently working full time and manag-

ing all community responsibilities appropriately. The [b]oard finds that the requested modifications to [the acquittee]'s Conditional Release would not increase his risk to himself or to the community."

Contemporaneous with this progress, however, the acquittee experienced other problems while on conditional release. To begin with, in October and November, 2009, the acquittee missed five days from work without notifying his conditional release supervisor, as required by the conditions of his release. When asked about these absences, the acquittee claimed that he did not know that he needed to provide notice of absences from work to his conditional release supervisor. In December, 2009, the acquittee's urine sample tested positive for codeine, a prescription drug for which the acquittee did not possess a prescription, following a random toxicology screening. Initially, the acquittee was defensive about the test results, claiming that they must have resulted from tampering with the urine sample or another mistake of some kind. Later, however, he explained that his coworker at Bob's Discount Furniture had given him the pills to ease his shoulder pain from moving furniture. As a result of this positive urine test, on January 14, 2010, the board issued a modification of conditional release, increasing the acquittee's home visits by probation to once per week, increasing his urine screens by probation to once per week, and adding a weekly substance abuse group at the Reliance House to his treatment schedule.

On December 15, 2009, the board conducted a hearing for modification of the acquittee's conditional release, following SMHA's request that he be discharged from sex offender treatment at The Connection, Inc. The board denied the modification, finding the following facts: "[The acquittee] has made good use of sex offender treatment at The Connection. He has demonstrated his ability to identify his risk factors, utilize coping mechanisms to mitigate those risk factors and develop a positive alliance with his treatment providers. Further, he has demonstrated, over time, his ability to maintain clinical stability such that he has minimized the risk he poses to the satisfaction of his treatment providers. However, [the acquittee] has a history of domestic violence and exposure to inappropriate and dysfunctional female relationships. He has yet to accomplish his goal of pursuing a healthy adult romantic relationship. This goal is hampered by his many years of inpatient hospitalization and the challenge of being listed on the Connecticut Sex Offender Registry. [The acquittee] can be greatly assisted by remaining involved with sex offender treatment experts who can guide and support him through the process of disclosing his status and history to women. Continuing his treatment with The Connection will provide [the acquittee] with the support necessary for the safe completion of the next stage in his recovery."

Between November, 2009, and July, 2010, the acquittee also experienced two instances of financial difficulty. The electricity to his apartment was shut off at a time when he should have had sufficient money to pay his bill. The acquittee had been receiving $300 per month in assistance to pay one half of his rent. Such assistance was scheduled to end in April, 2010, but he continued to receive it until June, 2010. The acquittee did not inform his treatment providers of the additional $600 he had mistakenly received as a result, but later explained that he had sent the $600 to his family to help them pay for funeral expenses following his brother's death in April, 2010.

In July, 2010, the acquittee's treatment providers discovered that he possessed an iPhone that was capable of accessing the Internet. The acquittee had failed to disclose his possession of this iPhone to his treatment providers and did not have permission to possess an Internet-capable device. He claimed to have borrowed the iPhone from a coworker without knowledge that it was capable of accessing the Internet.

Last, on July 8, 2010, the acquittee gave a urine sample in a random toxicology screening that tested positive for cocaine. When he was confronted about the positive test result, the acquittee initially was defensive and denied using cocaine. Later, however, he explained that when he was talking to his neighbor about his grief over the recent deaths of his mother and older brother, and the terminal cancer diagnoses of both his sister and his younger brother,[7] the neighbor, who is a drug dealer, offered him a line of cocaine to help him feel better, and he accepted. Prior to his positive drug test for cocaine, the acquittee had failed to notify his treatment providers, in violation of his conditional release, either that a drug dealer lived in his apartment complex or that his brother had been diagnosed with cancer.

As a result of his two positive drug tests within an eight month period, it was recommended that the acquittee return to CVH, and he did so voluntarily. Once he was readmitted to CVH, the acquittee reportedly felt anxious, stating that " 'maybe I should've talked about my problems earlier.' " Following his readmission, the acquittee's treatment providers reported that he was behaving appropriately with both staff and his peers. He began attending individual therapy with psychologist Richard Loughead, who described the acquittee "as having benefited from individual therapy, gaining insight into his past experiences and relationships, and [having] hope for the future." The acquittee discussed with Loughead what had contributed to his return to CVH from conditional release, including his cocaine use, his financial issues, and the death and terminal cancer diagnoses of his family members.

The most recent reports by CVH to the board, dated

October 17, 2011, and November 9, 2011, described the acquittee's condition as "major depressive disorder, recurrent, mild," and "in remission." At the time of these reports, CVH reported that the acquittee no longer required the aid of psychotropic medication, was "clinically stable," and "d[id] not present a substantial risk of harm to himself or others."

B

### Reports by the Board and Medical Experts

The acquittee's maximum commitment date was set to expire on February 6, 2010. By motion dated August 26, 2009, the state filed a petition for continued commitment of the acquittee, which was amended on August 31, 2009. A hearing was held on this matter before the court on October 12 and 13, 2011. Prior to the hearing, the board, as well as the state's and the acquittee's chosen psychiatrists, submitted reports for the court's consideration.

In its November 24, 2009 report, the board informed the court of its findings as follows: "[The acquittee] is an individual with a psychiatric illness and the diagnoses of Major Depressive Episode, Recurrent, Severe, with Mood Congruent Psychotic Features, In Full Remission; Cannabis Abuse, In Sustained Full Remission; Hallucinogen Abuse, In Sustained Full Remission and Antisocial Personality Traits, by history. During his many years of hospitalization and outpatient treatment, [the acquittee] has demonstrated progress in his understanding and acceptance of his mental illness, need for treatment and management of his risk factors for sexual reoffending. He is currently clinically stable and has maintained competitive employment and a positive relationship with his treatment providers. However, [the acquittee] committed multiple violent sexual assaults involving verbal threats and a weapon. While [the acquittee] has been actively involved in sexual offender treatment for many years, he has not yet developed and maintained a stable romantic relationship utilizing the skills taught during his many years of treatment. In the context of desiring to form such a relationship, [the acquittee] recently failed to disclose relevant information to his treatment team. [The acquittee]'s history is significant for childhood abuse and early sexual aggressive thoughts toward women. The prospect of a romantic relationship may place him in a position of vulnerability and a reactivation of his risk factors as evidenced by his noncompliance with treatment stipulations to disclose personal relationship issues to his treaters. [The acquittee]'s noncompliance is indicative of his need for continued monitoring and support to address this next aspect of his treatment. Therefore, the [b]oard finds that [the acquittee] would pose a danger without continued supervision under the jurisdiction of the [b]oard." The board concluded that the acquittee "remains an individual with psychiatric disabilities and

these disabilities are such that his discharge from the jurisdiction of the [b]oard would constitute a danger to himself or others." Accordingly, the board recommended that the court grant the state's petition.

The state's psychiatric expert, Donald R. Grayson, made five observations, opinions, and recommendations regarding the acquittee in his report dated January 8, 2010. First, he concluded that "[a] formal mental status examination revealed no current gross clinical evidence suggestive of psychosis, organic brain impairment, depression, mania, hypomania, anxiety or poorly controlled anger." Grayson reported that the acquittee "presented as a clean, appropriately attired, unguarded, cooperative, polite, friendly, outgoing, likeable, alert man . . . ." Second, Grayson noted that since the acquittee's full release into the community, "he has been living in his own apartment, has been successfully employed, has met his economic responsibilities, has done well with his treatment team, has been responsible for the taking of his own medications and has had no problems with legal authorities." Third, Grayson classified the acquittee's diagnoses as follows: "Major Depressive Disorder, recurrent, with psychotic features, in remission; Cannabis Abuse—in remission; Hallucinogen Abuse—in remission; Opioid Abuse (codeine)—recently confirmed by lab testing; Phobia of snakes—childhood onset—by history; Sexual Sadism (see enclosed DSM IV Criteria)—by records; Antisocial Personality Disorder." Fourth, Grayson opined that "on the basis of [the acquittee's memorandum of decision] violations over recent months . . . and the [board] deeming it necessary in recent months to increase [the acquittee]'s supervision and restrictions, it does not seem prudent, in terms of [the acquittee]'s safety and the safety of others, for [the acquittee] to be released from the supervision of the [board] for at least the next couple of years." Last, based on the acquittee's extensive history, dating back to childhood, of traumatic experiences that led to the development of rage directed at others, Grayson expressed that he has "major reservations about ever totally releasing [the acquittee] from some type of court ordered supervision—no matter how minimal—by the [board]."

Grayson subsequently submitted an eleven page supplemental report dated September 30, 2011, in which he stated that he has "no hesitation, at this point, in endorsing a plan to have [the acquittee] live in a community outside of a hospital setting." Grayson was, "however, still reluctant to endorse [the acquittee]'s release from the supervision of the [board]." Grayson's conclusion was based upon the seriousness of the sexual assault offenses committed by the acquittee in 1983 that led to his commitment; his psychotic behavior at the time of the 1983 offenses; his extremely traumatic history during his childhood involving sexual assault and physical and verbal abuse; his psychotic-like symp-

toms as a child that led Grayson to opine that "with enough stress and/or substance abuse, he could have another psychotic decompensation and act aggressively towards others"; his "lifelong behavioral pattern" of aggression toward women, dating back to childhood; his history of sexual sadism; his failed attempt to establish a romantic relationship with a woman; his history of abusing marijuana and psilocybin mushrooms; and the fact that in 2009, when he was seemingly within months of his release from the board, he tested positive for codeine and cocaine on different occasions, and ultimately returned from living independently in the community to the care of CVH. Grayson stated that he believed that "there is a better than minimal chance that he again could be a danger to the community. . . . [T]here is a chance that he will return to substance abuse, a chance that he will decompensate again emotionally and a chance that he will return to sexually aggressive behavior."

The acquittee's psychiatric expert, Peter M. Zeman, in his March 30, 2010 report, concluded that the acquittee "no longer requires the oversight and supervision of the [board]. He is safe and appropriate for discharge from the [b]oard at this time." Zeman diagnosed the acquittee with "Major Depressive Disorder, recurrent, severe, with psychotic features, in full remission; Cannabis Abuse, in sustained full remission; and Hallucinogen Abuse, in sustained full remission." Zeman opined, "with reasonable psychiatric certainty, that [the acquittee] shows no evidence of an active psychiatric illness. He has responded well to his treatment program and is committed to remaining in treatment and on his current regimen of psychiatric medications whether or not he is under the supervision of the [board]. He is functioning well in the community, and . . . presents no danger to himself or others. Specifically, he does not present a risk of aggressive sexual behavior towards women."

Zeman submitted a supplemental report dated July 26, 2011, in which he echoed his March 30, 2010 opinion "with reasonable psychiatric certainty, that [the acquittee] shows no evidence of an active psychiatric illness. He has responded well to treatment. His rehospitalization was precipitated by a one-time use of cocaine which is unlikely to recur. He functioned well in the community up to the time of his latest hospitalization, and . . . he presents no danger to himself or others. Specifically, he does not present a risk of aggressive sexual behavior towards women." Zeman ultimately concluded that, in his opinion, the acquittee "no longer requires the oversight and supervision of the [board]. He is safe and appropriate for discharge from the [b]oard at this time."

In total, the evidence before the court included the testimony of five witnesses, twenty-nine state's exhib-

its, and seventy-four acquittee's exhibits. Following the hearing, the parties stipulated to the admission of three additional exhibits: The acquittee's most recent six month review report dated October 11, 2011; an addendum to that report; and Zeman's response to the last report and addendum.[8] More than two months after the hearing, on December 21, 2011, the court announced its oral decision granting the state's petition for continued commitment of the acquittee to the jurisdiction of the board for a period not to exceed two years from the date of the decision.

C

### The Court's Findings and Conclusions

In granting the state's petition, the court made the following factual findings: "One. The [acquittee] has made substantial progress in understanding and managing his mental illness since his initial commitment to the [board] in 1985. Two. Since that commitment, [the acquittee] transitioned from a maximum security facility to a less restrictive environment to overnight passes to the community to a full conditional release to the community. Three. [The acquittee] lived and worked full-time in the Norwich community for approximately six years until July, 2010, during which time up until the last six months of his conditional release he was compliant with treatment, and his mental illness and substance abuse issues appeared to be in full remission. Four. Several months prior to July of 2010, [the acquittee]'s mental status deteriorated. He tested positive on one occasion for codeine and on another occasion for cocaine. He was not forthcoming but was instead defensive about this discovered abuse. Five. At about the same time and while he was still in the community, [the acquittee] had not disclosed issues he was having with his finances, social contacts, and sexual activities. Six. Due to those issues, [the acquittee] was rehospitalized in July of 2010. Since that time, he has been actively engaged in treatment and compliant. In this controlled setting, [the acquittee]'s mental illness is in remission, and his substance abuse is as well. An updated risk assessment for sexual reoffending is forthcoming. Seven. The treatment team is working on a development plan for [the acquittee]'s engagement in the Hartford community, a new and untested environment for [the acquittee]. Eight. The expert testimony is in conflict as to whether [the acquittee] remains a danger to himself or others or to the property of others. Nine. This court's main concern is [the acquittee]'s recent rehospitalization and the attendant discovery of issues which he did not previously disclose to his treaters while on conditional release in the Norwich community."

On the basis of the foregoing findings, the court made the following conclusion: "[T]he [acquittee] is clinically stable in his currently controlled—controlled is empha-

sized and underlined—environment but that the state has proven by clear and convincing evidence, if removed from that controlled environment, [the acquittee] is at great risk to mentally relapse.

"Without his current inpatient treatment and supervision, [the acquittee] will continue to suffer from psychiatric disabilities in that he has continued difficulty in disclosing relevant information to his treaters about his personal issues, including finances, social contacts, and sexual activities.

"Thus, the state has proven by clear and convincing evidence that [the acquittee] at this time continues to present a risk to the safety of himself or others or present a danger to himself or others or to the property of others.

"Accordingly, the state's motion to extend the acquittee's commitment is granted. And this court orders the acquittee . . . to be committed to the [board] for an additional period of time not to exceed two years from the date of this decision.

"This court strongly recommends to the [b]oard [that] a transitional plan be in place for [the acquittee] to engage fully in a conditional release in the Hartford community in the next twelve months, to then be monitored for compliance in the community for the second twelve month period of this commitment with the goal of discharge from the [board] at the end of this two year commitment provided the acquittee has been fully compliant."

II

STANDARD OF REVIEW

With those facts and history in mind, we now turn to the claim raised by the acquittee on appeal. The acquittee argues that the court erred in granting the state's petition for his continued commitment. At issue is whether the court applied the proper standard when granting the state's petition, that because of a *current* mental illness, the acquittee would pose a risk of *imminent* injury to himself or others if discharged from the board's jurisdiction. We disagree with the acquittee and conclude that the court applied the proper standard.

The continued commitment of an acquittee is governed by § 17a-593 (c), which provides: "If reasonable cause exists to believe that the acquittee remains a person with psychiatric disabilities or a person with intellectual disability to the extent that his discharge at the expiration of his maximum term of commitment would constitute a danger to himself or others, the state's attorney, at least one hundred thirty-five days prior to such expiration, may petition the court for an order of continued commitment of the acquittee."[9] "In [a] continued commitment proceeding, the state b[ears] the burden of proving by clear and convincing evidence

that the acquittee is currently mentally ill and dangerous to himself or herself or others or gravely disabled."[10] (Internal quotation marks omitted.) *State* v. *Maskiell*, 100 Conn. App. 507, 521, 918 A.2d 293, cert. denied, 282 Conn. 922, 925 A.2d 1104 (2007).

"[T]he confinement of insanity acquittees, although resulting initially from an adjudication in the criminal justice system, is not punishment for a crime. The purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and society from his potential dangerousness. The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous. . . . As he was not convicted, he may not be punished. His confinement rests on his continuing illness and dangerousness." (Internal quotation marks omitted.) *Payne* v. *Fairfield Hills Hospital*, 215 Conn. 675, 683–84, 578 A.2d 1025 (1990).

"The determination as to whether an acquittee is currently mentally ill to the extent that he would pose a danger to himself or the community if discharged is a question of fact and, therefore, our review of this finding is governed by the clearly erroneous standard. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . ." (Internal quotation marks omitted.) *State* v. *Maskiell*, supra, 100 Conn. App. 521–22. "Conclusions are not erroneous unless they violate law, logic or reason or are inconsistent with the subordinate facts. The court's conclusions are to be tested by the findings and not the evidence. . . . Conclusions logically supported by the finding must stand." (Citations omitted.) *State* v. *Warren*, 169 Conn. 207, 213–14, 363 A.2d 91 (1975). We address separately in the following sections the court's determination that the acquittee suffered from a current mental illness and that, if released from the jurisdiction of the board, such mental illness would cause him to present a risk of imminent physical injury to himself or others.

A

The Court's Mental Illness Determination

With regard to the court's mental illness determination, the acquittee argues that the court erred in granting the state's petition because the state did not prove, by clear and convincing evidence, that he suffers from a current mental illness. He also asserts that the court did not apply the appropriate standard when evaluating the evidence to make its mental illness determination.

The acquittee claims that the state did not meet its burden of proving that his mental illness of "major depressive disorder, recurrent, severe, with psychotic

features, in full remission,"[11] may become active with reasonable medical probability, a standard he discerns from General Statutes § 17a-580 (7), which defines mental illness as: "[A]ny mental illness in a state of remission when the illness may, with reasonable medical probability, become active . . . ." See also Regs., Conn. State Agencies § 17a-581-2 (a) (5).[12] The acquittee claims that the court did not set forth or apply this definition when making its finding that he "is at great risk to mentally relapse." The acquittee argues that the phrases "at great risk to mentally relapse" and "may, with reasonable medical probability, become active," are not equivalent standards by which the court can conclude that he currently suffers from a mental illness. We disagree with the acquittee that there is a discernible difference between the two phrases.

The court's conclusion that the acquittee is "at great risk to mentally relapse" does not violate law, logic or reason, nor is it inconsistent with the subordinate facts. *State* v. *Warren*, supra, 169 Conn. 213–14. Further, the court's conclusions are logically supported by its findings that the acquittee is a person with psychiatric disabilities, as defined by the applicable statute and regulation. This is so despite the fact that neither Grayson nor the court phrased their conclusions using the exact terminology of the statute and regulation. By analogy, our Supreme Court, in medical malpractice cases, has "reject[ed] the proposition that certain formulaic words are essential when an expert renders an opinion." *Struckman* v. *Burns*, 205 Conn. 542, 555, 534 A.2d 888 (1987) (rejecting claim that "an expert in his testimony or in a report must employ the 'magic words' that his opinion was 'reasonably probable' "). In addition, this court has stated that "we do not believe that it is mandatory to use talismanic words or the particular combination of magical words represented by the phrase reasonable degree of medical certainty [or probability] . . . ." (Internal quotation marks omitted.) *Macchietto* v. *Keggi*, 103 Conn. App. 769, 776, 930 A.2d 817, cert. denied, 284 Conn. 934, 935 A.2d 151 (2007).

The testimony of and the reports submitted by Grayson, the state's sole witness, although not employing the "magic words" that the acquittee's mental illness "may, with reasonable medical probability, become active," still do support the conclusion of the court that the acquittee is "at great risk to mentally relapse." Although the court is not required to rely upon the testimony of medical experts,[13] it summarized the conclusions of both medical experts as well as the testimony of the other three witnesses before issuing its findings and conclusions. The court also noted specifically that "Dr. Grayson concluded with a reasonable degree of medical certainty that [the acquittee] remained someone who suffered from a psychiatric disability and remained a danger to himself and/or others and should not be discharged from the [board]

. . . ." The court also noted that Zeman "concluded in his expert opinion and with a reasonable degree of medical certainty that [the acquittee] no longer suffered from a psychiatric disability and no longer posed a threat to himself and/or others or property and would not be a danger if discharged from the [board] . . . ." The court reviewed and weighed the entire substance of the experts' testimony and reports when making its findings that the acquittee suffers from a current mental illness.[14]

Specifically, the court found that the acquittee "has made substantial progress in understanding and managing his mental illness since his initial commitment to the [board] in 1985," and "up until the last six months of his conditional release he was compliant with treatment, and his mental illness and substance abuse issues appeared to be in full remission." The court then went on to find that "[s]everal months prior to July of 2010, [the acquittee]'s mental status deteriorated" and that since his rehospitalization, "he has been actively engaged in treatment and compliant." The court found that "[i]n this controlled setting, [the acquittee]'s mental illness is in remission, and his substance abuse is as well," but ultimately concluded that "the state has proven by clear and convincing evidence [that] if removed from that controlled environment, [the acquittee] is at great risk to mentally relapse." The court also concluded, on the basis of its findings, that "[w]ithout his current inpatient treatment and supervision, [the acquittee] will continue to suffer from psychiatric disabilities . . . ."

When making its mental illness determination, the court set forth the proper standard of review and examined the record before it, including the testimony and reports submitted by Grayson and Zeman, to support its findings and conclusion that, if discharged from the board's jurisdiction, the acquittee would be "at great risk to mentally relapse." There is no legally significant difference between the court's finding that the acquittee would be "at great risk to mentally relapse" if he were discharged and the finding he claims the board should have made before extending his commitment, to wit: that, if discharged, "[his mental illness] may, with reasonable medical probability, become active." A finding of great risk that, in given circumstances, a patient with an undesirable mental condition in remission will mentally relapse, when based upon the opinion of an experienced psychiatrist, is surely no less predictive that the condition will recur than a finding to a reasonable medical probability that the condition may once again become active. The court thus clearly made findings regarding the acquittee's condition that met the definition of mental illness under the statute and regulation. Under those circumstances, the fact that the court did not use the specific words "may, with reasonable medical probability, become active," does not warrant

reversal under the clearly erroneous standard of review. See *State* v. *Robinson*, 227 Conn. 711, 731, 631 A.2d 288 (1993) (failure by trial court to use "talismanic" words does not indicate failure to make necessary determination). Thus, the acquittee's first claim fails.

B

*The Court's Dangerousness Determination*

The acquittee next claims that the court's ruling on his dangerousness is not supported by clear and convincing evidence, or alternatively, that it improperly rests upon speculative conditions precedent, that due to a current mental illness, he poses a risk of imminent physical injury to himself or others if released from the jurisdiction of the board. Specifically, he claims that the state was required, but failed, to establish by clear and convincing evidence that he posed a risk of *imminent* physical injury to himself or others, meaning a risk that physical injury is "ready to take place" or "hanging threateningly" over him.[15]

"The purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and society from his potential dangerousness. The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous. . . . As he was not convicted, he may not be punished. His confinement rests on his continuing illness and dangerousness." (Internal quotation marks omitted.) *Payne* v. *Fairfield Hills Hospital*, supra, 215 Conn. 683–84.

"[T]he determination of dangerousness in the context of a mental status hearing reflects a societal rather than a medical judgment, in which the rights and needs of the defendant must be balanced against the security interests of society."[16] *State* v. *Putnoki*, 200 Conn. 208, 221, 510 A.2d 1329 (1986). The court correctly noted that its "inquiry should focus on whether the person is a danger to himself or others, whether he presents . . . the risk of imminent physical injury to others or self," quoting *State* v. *March*, 265 Conn. 697, 709, 830 A.2d 212 (2003), and citing *State* v. *Harris*, supra, 277 Conn. 378. "[T]he ultimate determination of mental illness and dangerousness is a legal decision"; *State* v. *Putnoki*, supra, 219; in which "the court may and should consider the entire record available to it, including the defendant's history of mental illness, his present and past diagnoses, his past violent behavior, the nature of the offense for which he was prosecuted, the need for continued medication and therapy, and the prospects for supervision if released." Id., 221.

The court here set forth the proper standard for determining dangerousness and conducted its review in accordance with that standard. In its discussion, the court detailed the testimony and reports submitted by Grayson and Zeman as well as other testimony and

exhibits admitted at the hearing. As for Grayson, the court noted that, as of January, 2010, he had "reservations about ever totally releasing the acquittee from the jurisdiction of the [board] but . . . that [the acquittee] could at some point go back into the community with proper supervision and treatment." The court further noted that, as of January, 2011, the date of Grayson's addendum, his conclusion remained unchanged, for "[h]e felt that [the acquittee] had made good gains but he was not ready yet and should remain under the [board]'s jurisdiction." Ultimately, "Grayson concluded with a reasonable degree of medical certainty that [the acquittee] . . . remained a danger to himself and/or others and should not be discharged from the [board] . . . ." Grayson expressed that "there is a better than minimal chance that he again could be a danger to the community. . . . [T]here is a chance that he will return to substance abuse, a chance that he will decompensate again emotionally and a chance that he will return to sexually aggressive behavior."

The court also credited the testimony of the acquittee's supervisor, Stephen Moore, who, prior to the acquittee's decompensation, had "felt [that] the acquittee showed insight into his past behavior, participated in group, and effectively handled feedback," and, thus, at one point, had recommended that he be discharged from the board's jurisdiction. Following the acquittee's decompensation in 2008 and 2009, however, Moore became "concerned when he discovered that the acquittee had not disclosed a personal relationship and he had test[ed] positive for the use of cocaine." Moore thus echoed the concern of Grayson "that if [the acquittee] were to return to regular use of illicit substances, such use could correlate to a higher risk of recidivism." Grayson and Moore both advised the court that, in their opinion, without the continuing supervision of the board, there remains a risk of the acquittee returning to substance abuse, which, in turn, could lead to sexually aggressive behavior, following the same pattern of substance abuse and that led up to the acts of violence in 1983, which resulted in the charges of which he was acquitted by reason of mental disease or defect.

As for Zeman, the court summarized his opinion as follows: "[The acquittee's] major depressive disorder with psychotic features was in full remission and had been for twenty-five years with an extremely low probability of a recurrence. . . . [The acquittee] had faced a number of stressors while on conditional release and handled them appropriately with the exception of his onetime self-medication with cocaine after some family deaths. Dr. Zeman concluded in his expert opinion and with a reasonable degree of medical certainty that [the acquittee] no longer suffered from a psychiatric disability and no longer posed a threat to himself and/or others or property and would not be a danger if discharged

from the [board] . . . ."

The court also summarized its review of the other witnesses' testimony and exhibits. As for Marsh, the court recalled that although he once had believed that the acquittee was substantially compliant under his supervision, he conceded that the acquittee had logged onto a social network, had not been honest with him about the codeine and cocaine incidents, and had begun to make new disclosures to his treatment providers of previously withheld information. The court also considered the testimony of the acquittee, who stated that, if discharged, he would continue with substance abuse and sex offender treatment, reconnect with his social worker, attempt to regain his employment with Bob's Discount Furniture, and utilize his friends in the Norwich community for support.

The court also considered CVH's six month report following the acquittee's rehospitalization, dated October 11, 2011, which noted that, although the acquittee was adjusting well to his rehospitalization, had been compliant with his treatment program, was clinically stable, and stable as to his drug abuse in his current, controlled environment, there was no recommendation for any change in his in-patient status at that time. The court summarized its conclusions in an addendum to that report dated November 9, 2011, in which it noted that the acquittee's "case is currently managed. [The acquittee] does not present a substantial risk to himself or others . . . ." Last, the court summarized in its discussion that Zeman's response to CVH's sixth month report and addendum was that the acquittee does not currently have substance abuse issues and that there is no recurrent pattern of abuse.

On the basis of these reports and testimony, and all of the state's and acquittee's exhibits that were entered into evidence at the hearing, the court found that, as to the acquittee's dangerousness, "[t]he expert testimony is in conflict as to whether [the acquittee] remains a danger to himself or to others or to the property of others." Although the acquittee presented the testimony of an expert who testified that he did not present a danger either to himself or to others, the court was free to reject that testimony in favor of the findings of the board and Grayson. As our Supreme Court has noted, "the goals of a treating psychiatrist frequently conflict with the goals of the criminal justice system. . . . While the psychiatrist must be concerned primarily with therapeutic goals, the court must give priority to the public safety ramifications of releasing from confinement an individual who has already shown a propensity for violence. As a result, the determination of dangerousness in the context of a mental status hearing reflects a societal rather than a medical judgment, in which the rights and needs of the defendant must be balanced against the security interests of society. . . .

The awesome task of weighing these two interests and arriving at a decision concerning release rests finally with the trial court." (Internal quotation marks omitted.) *State* v. *March*, supra, 265 Conn. 712.

The court then concluded that, although the acquittee "is clinically stable in his currently controlled . . . environment . . . [he] is at great risk to mentally relapse" and, thus, "the state has proven by clear and convincing evidence that [the acquittee] at this time continues to present a risk to the safety of himself or others or present a danger to himself or others or to the property of others." The court's conclusion, which is logically supported by the evidence before it, is not that the acquittee, in his currently controlled environment under the board's supervision poses a risk of imminent harm to himself or others, but rather, that *if* he were to be released from the board's supervision entirely, he would under those circumstances, present a danger to himself or others. The court followed its conclusion by "strongly recommend[ing] to the [b]oard [that] a transitional plan be in place for [the acquittee] to engage fully in a conditional release in the Hartford community in the next twelve months, to then be monitored for compliance in the community for the second twelve month period of this commitment with the goal of discharge from the [board] at the end of this two year commitment provided the acquittee has been fully compliant."

"To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *March*, supra, 265 Conn. 711. In its decision, the court clearly credited the testimony and reports of Grayson and the board, which it was free to do, and found that the acquittee "continues to present a risk to the safety of himself or others . . . ." The court's finding with regard to the acquittee's dangerousness was not clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] The crimes with which the acquittee was charged were summarized as follows by psychologist Justin Winkel, in his psychological assessment dated March 2, 2011: "The first victim reported being grabbed by her arm and neck, dragged to a dark wooded area, threatened with a knife held to her throat, and forcibly sexually assaulted. The second victim reported being grabbed by a man in a ski mask, but was able to escape while her screams attracted nearby people. The third victim reported being attacked by [the acquittee] while she was entering her car, and was forced to keep her head down while [the acquittee] drove 10 minutes to an isolated area and then

forcibly sexually assaulted her. This victim reported that [the acquittee] claimed to have a knife and put on gloves before assaulting her. All of the victims were adult females and were previously unknown to [the acquittee]."

[2] The board, in its memorandum of decision granting the acquittee full conditional release, set the following conditions for the acquittee, which were to remain in effect throughout his conditional release:

"[The Acquittee]'s Responsibilities and Authorizations: Comply with all conditions of this conditional release; Cooperate with all community providers and his probation officer as it relates to agency rules, regulations, recommendations and treatment; Participate in a substance abuse program as deemed appropriate by community providers at least three times per week, and provide proof of attendance at community meetings to his conditional release supervisor; Comply with all requirements of Sections 54-250 through 54-261 of the Connecticut General Statutes, cooperate with the Department of Public Safety and complete all verification of address statements issued by the Department of Public Safety; Inform his conditional release supervisor of all medical appointments and medical recommendations; Inform his conditional release supervisor of any missed meetings, sessions or absences from work; Maintain employment for up to 40 hours per week, which can be substituted if approved by conditional release supervisor, his probation officer and other community providers with another viable day treatment program, volunteer work, educational pursuit or employment activity; Notify [the Southeastern Mental Health Authority] if unable to arrange transportation; Provide Releases of Information (ROI), as requested; Submit to a search of person, residence and property or Internet use by community providers or any law enforcement officer; Inform any community provider of a change in mood or behavior; May operate a motor vehicle to travel to and from work, treatment and leisure/recreational activities with approval from his conditional release supervisor and Reliance House staff and with proof of registration and insurance; May be a passenger in a motor vehicle with someone other than staff with approval by his conditional release supervisor and Reliance House staff; Utilize a sign in/sign out sheet at his residence; May travel in his own custody and participate in leisure/recreational activities in the state of Connecticut between the hours of 6:00 a.m. and 11:00 p.m.; May travel out of the state of Connecticut to Massachusetts, New York and Rhode Island to participate in day trips with staff of Reliance House; Carry a copy of this order when traveling out of the state of Connecticut.

"[The Acquittee]'s Restrictions and Prohibitions: Have no contact or communication with the victims of his crimes, which includes not visiting or frequenting their places of residence, work or crime scenes, whether they are present or not; Have no contact with his ex-wife . . . May not transport minors in a motor vehicle; May only utilize the Internet at the Reliance House Teamworks Social Club under the supervision of staff; Obey all laws and promptly report to conditional release supervisor the fact that he has been arrested for, charged with or questioned by any law enforcement agent regarding any matter; Not use any alcoholic beverages; Not enter any establishment where the primary purpose of that establishment is the sale of alcohol; Not enter the town of Middletown except with community staff for purposes of treatment or to attend [b]oard meetings; Not leave the state of Connecticut except as specified above; Not use, possess, handle, traffic in, transport, or otherwise be involved with any illegal narcotics, dangerous drugs or controlled substances; Not use any medication without a prescription or use over-the-counter medication without notification to conditional release supervisor; Not own, use, possess, receive, transport or have access to any firearm, ammunition, defensive or other weapons including but not limited to his place of work, residence or residences of those he visits; Not knowingly associate or participate in any activities with persons known to carry weapons including but not limited to, his place of work, residence or residences of those he visits; Not knowingly associate with persons who have been arrested for, charged with, convicted of, or involved in any criminal activity without the prior authorization of his conditional release supervisor and notification to the [b]oard; Not gamble, which includes government-sponsored lotteries, or enter any casino grounds."

[3] Facebook is a social network website. See *State* v. *Altajir*, 303 Conn. 304, 306 n.1, 33 A.3d 193 (2012).

[4] Gmail is a website based e-mail account provider.

[5] On June 8, 2009, following a hearing to consider a modification of conditional release filed by SMHA, requesting a reduction in conditional release supervision meetings and permission for the acquittee to use the Internet and e-mail for employment purposes, the board found that the acquittee's "community providers and his probation officer agree that employment for [the acquittee] would be positive and Internet access is important in locating such employment. Allowing [the acquittee] to have limited access to the

Internet for the purposes of seeking employment under direct supervision is appropriate and would not constitute a danger to himself or others."

[6] On September 21, 2009, the board granted an application for out-of-state travel, permitting the acquittee to travel to South Carolina to visit his mother, who had suffered a stroke. The board found that the acquittee "has remained cooperative with treatment recommendations and has improved his relationship with his mother. [The acquittee]'s sister has communicated with [the acquittee]'s Conditional Release Supervisor and has been advised of his travel conditions and stipulations. Under the conditions contained within the application and this order, the Chairman concludes that [the acquittee] would not constitute a danger to himself or others while traveling out of the state to visit his mother . . . ." Thereafter, on October 6, 2009, the board granted a further application for out-of-state travel to permit the acquittee to attend his mother's funeral. The board found that the acquittee "recently traveled out of the state of Connecticut without incident and complied with all travel requirements. Allowing him to participate in funeral services for his mother is clinically appropriate and will not increase his risk to the community or himself."

[7] The acquittee's mother died in October, 2009, and his older brother died in April, 2010. At about the time of the acquittee's mother's death, his sister was diagnosed with breast cancer and, shortly before the acquittee's cocaine use, his younger brother was diagnosed with throat cancer.

[8] The six month review dated October 11, 2011, showed that the acquittee has adjusted well to his rehospitalization at CVH, has been compliant with his treatment program, and has participated in both individual and group therapies. The report indicated that the acquittee's depression is recurrent, but mild, his drug abuse is stable because of his controlled environment, and that he still suffers from a personality disorder. The report also stated that the acquittee's treatment team was developing a plan for his treatment in the Hartford community. The addendum to that report provided that the acquittee's depressive disorder is in remission and that he "does not present a substantial risk to himself or others . . . ." Zeman responded to this report and addendum by agreeing that the acquittee's depression is in remission but disagreeing as to any substance abuse issues, asserting that there is no recurrent pattern of abuse.

[9] The court properly included § 17a-593 (c) in its memorandum of decision and ensured that the parties timely filed all necessary petitions, notices, and reports.

[10] The court properly set forth the state's burden of proof in its memorandum of decision as follows: "In a proceeding such as this brought pursuant to Connecticut General Statutes § 17a-593 (c) to extend an acquittee's commitment past the maximum commitment date, the state must prove by clear and convincing evidence that the acquittee is currently mentally ill and poses a danger to himself or others or property or is gravely disabled."

[11] There is no dispute between Grayson and Zeman, based on the diagnoses made in their most recent supplemental reports, that the acquittee suffers from "major depressive disorder, recurrent, severe, with psychotic features, in full remission," or that this is the mental illness germane to the court's mental illness determination.

[12] Section 17a-581-2 (a) (5) of the Regulations of Connecticut State Agencies defines "mental illness," in part, as follows: "[A]ny mental illness in a state of remission which may become active with reasonable medical probability."

[13] "[T]he ultimate determination of mental illness and dangerousness is a legal decision." *State* v. *Putnoki*, 200 Conn. 208, 219, 510 A.2d 1329 (1986). "Although psychiatric testimony as to the defendant's condition may form an important part of the trial court's ultimate determination, the court is not bound by this evidence. . . . It may, in its discretion, accept all, part, or none of the experts' testimony. . . . In reaching its difficult decision, the court may and should consider the entire record available to it, including the defendant's history of mental illness, his present and past diagnoses, his past violent behavior, the nature of the offense for which he was prosecuted, the need for continued medication and therapy, and the prospects for supervision if released." (Citations omitted.) Id., 221.

[14] The court stated: "Dr. Zeman readily admitted that he was in disagreement with Dr. Grayson's opinions as well as in disagreement with some of [the acquittee's] current treaters . . . ."

[15] The regulations define "danger to self or others" as "the risk of imminent physical injury to others or self, and also includes the risk of loss or destruction of the property of others." Regs., Conn. State Agencies § 17a-581-2 (a)

(6). " 'Imminent' is defined as 'ready to take place; esp: hanging threateningly over one's head . . . .' " *State* v. *Harris*, 277 Conn. 378, 389, 890 A.2d 559 (2006), quoting Merriam-Webster's Collegiate Dictionary (10th Ed. 1993).

[16] The court referenced this standard by quoting *State* v. *Warren*, 100 Conn. App. 407, 433, 919 A.2d 465 (2007), stating that "[t]he determination of dangerousness . . . reflects a societal rather than a medical judgment, in which the rights . . . of the [acquittee] must be balanced against the security interests of society." (Internal quotation marks omitted.) It further cited *State* v. *Putnoki*, supra, 200 Conn. 221, when it stated that "the rights and needs of a defendant must be balanced against the security interests of society. That determination rests with the trial court."