******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

STATE OF CONNECTICUT *v.*
CHRISTOPHER DEANGELO
(AC 47032)

Suarez, Seeley and Bishop, Js.

*Syllabus*

The defendant acquittee, who previously had been found not guilty of certain crimes by reason of mental disease or defect and who had been committed to the jurisdiction of the Psychiatric Security Review Board, appealed from the trial court's judgment granting the state's petition to extend his commitment to the board pursuant to statute (§ 17a-593 (c)). He claimed that the court improperly determined that the state met its burden of proving by clear and convincing evidence that, after having served his maximum term of commitment, his discharge would constitute a danger to himself or others. *Held*:

The trial court improperly granted the state's petition to continue the defendant's commitment, as the state did not meet its burden of proving that the defendant's discharge would constitute an imminent danger to himself or others, and, thus, this court reversed the trial court's judgment and directed that court to deny the state's petition.

Argued March 12—officially released July 22, 2025

*Procedural History*

Petition for an order extending the defendant's commitment to the jurisdiction of the Psychiatric Security Review Board, brought to the Superior Court in the judicial district of Ansonia-Milford and tried to the court, *Hall, J.*; judgment granting the petition, from which the defendant appealed to this court. *Reversed; judgment directed.*

*Kevin L. Semataska*, assistant public defender, for the appellant (defendant).

*Jonathan M. Sousa*, assistant state's attorney, with whom, on the brief, was *Margaret E. Kelley*, state's attorney, for the appellee (state).

*Kirk W. Lowry* filed a brief for the Connecticut Legal Rights Project as amicus curiae.

*Opinion*

BISHOP, J. The defendant, Christopher DeAngelo, as an acquittee,[1] appeals from the judgment of the trial court granting the state's petition to continue commitment (petition) to the jurisdiction of the Psychiatric Security Review Board (board)[2] for an additional period of five years. The dispositive issue in this appeal is whether the court properly determined that the state met its burden of proving by clear and convincing evidence that the defendant, after serving his maximum term of commitment, presently constitutes a danger to himself or others.[3] See, e.g., *State* v. *Torell*, 223 Conn.

---

[1] General Statutes § 17a-580 provides in relevant part: "(1) 'Acquittee' means any person found not guilty by reason of mental disease or defect pursuant to section 53a-13 . . . ." See also *State* v. *Metz*, 230 Conn. 400, 405, 645 A.2d 965 (1994).

[2] "The board is an administrative body consisting of a psychiatrist, a psychologist, a probation expert, a layperson, an attorney who is a member of the state bar, and a layperson with experience in victim advocacy. General Statutes § 17a-581 (b). The purpose of this administrative body is to manage, monitor and review the status of each acquittee to ensure the protection of the general public. . . . That being its purpose, the board has general and specific familiarity with all acquittees beginning with their initial commitment . . . ." (Internal quotation marks omitted.) *State* v. *Torell*, 223 Conn. App. 21, 27 n.11, 307 A.3d 280 (2023), cert. denied, 348 Conn. 960, 312 A.3d 36 (2024); see also *Payne* v. *Fairfield Hills Hospital*, 215 Conn. 675, 677, 578 A.2d 1025 (1990).

[3] The defendant also argues that (1) the court improperly presumed that he was dangerous and placed the burden on him to prove the contrary in violation of his constitutional right to due process, (2) the court's interpretation of General Statutes § 17a-593 rendered it unconstitutionally void for vagueness, and (3) the Connecticut constitution affords him greater protection than the federal constitution. The amicus curiae brief filed by the Connecticut Legal Rights Project also argues that the defendant's continued commitment to the jurisdiction of the board amounts to a violation of his constitutional rights.

As a result of our conclusion that the court improperly determined that the state met its burden of proving that the defendant would constitute a danger to himself or others, we need not address these constitutional claims. It is well settled that "[w]e . . . do not engage in addressing constitutional questions unless their resolution is unavoidable. Ordinarily, [c]onstitutional issues are not considered unless absolutely necessary to the decision of a case." (Internal quotation marks omitted.) *State* v. *McCahill*, 261 Conn. 492,

App. 21, 38, 307 A.3d 280 (2023), cert. denied, 348 Conn. 960, 312 A.3d 36 (2024). On the basis of our thorough review of the record in this matter, we determine that there is no support for the court's conclusion that the state met its heightened[4] burden and, therefore, that the court improperly granted the state's petition. Accordingly, we reverse the judgment of the trial court and remand the case with direction to deny the state's petition for the defendant's continued commitment to the jurisdiction of the board.

The record reveals that the conduct underlying the defendant's index offenses[5] occurred on December 2, 1997, when he committed a robbery and larceny at the First Union Bank in Derby. See *State* v. *DeAngelo*, Superior Court, judicial district of Ansonia-Milford, Docket No. CR-97-0108766-S (February 24, 2000). On that date, the defendant entered the bank armed with a pellet gun while wearing a disguise consisting of a fake mustache and beard. He ordered the assistant manager to fill his briefcase with money while also telling her that he did not intend to hurt her. The assistant

501, 811 A.2d 667 (2002); see also *In re Kaleb H.*, 306 Conn. 22, 26 n.3, 48 A.3d 631 (2012) ("[t]his court has a basic judicial duty to avoid deciding a constitutional issue if a nonconstitutional ground exists that will dispose of the case" (internal quotation marks omitted)); see generally *State* v. *Shane K.*, 228 Conn. App. 105, 118, 322 A.3d 1094 (2024); *Gonzalez* v. *Commissioner of Correction*, 205 Conn. App. 511, 522 n.13, 258 A.3d 97, cert. denied, 339 Conn. 909, 261 A.3d 745 (2021), cert. denied,      U.S.     , 142 S. Ct. 1238, 212 L. Ed. 2d 240 (2022); *State* v. *Lopez*, 177 Conn. App. 651, 662, 173 A.3d 485, cert denied, 327 Conn. 989, 175 A.3d 563 (2017).

[4] Our Supreme Court has stated that "[the clear and convincing burden of proof] is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Internal quotation marks omitted.) *State* v. *Perez*, 276 Conn. 285, 308, 885 A.2d 178 (2005).

[5] "The psychiatric profession refers to the offenses that led to an acquittee's arrest as index offenses." (Internal quotation marks omitted.) *State* v. *Foster*, 217 Conn. App. 476, 487 n.5, 289 A.3d 191, cert. granted, 346 Conn. 920, 291 A.3d 1041 (2023).

manager then went to the safe, filled the briefcase with $54,000, and delivered it to the defendant. After showing the pellet gun to the assistant manager, the defendant left the bank. Outside, as he was entering his motor vehicle, police officers ordered him to halt. The defendant ignored the officers' commands. Instead, he began to drive away with the officers giving chase. With the defendant in flight, the officers fired their weapons at the defendant's motor vehicle, striking it several times. During this pursuit, the defendant's vehicle nearly hit a Derby police officer.

Shortly thereafter, the defendant was apprehended in a nearby parking lot. In addition to the pellet gun, the police retrieved from the defendant's vehicle a double barrel shotgun loaded with one live round. The next day, the state charged the defendant with, inter alia, robbery in the first degree in violation of General Statues § 53a-134, larceny in the first degree in violation of General Statutes (Rev. to 1997) § 53a-122, and attempt to commit assault in the first degree in violation of General Statutes § 53a-49 and General Statutes (Rev. to 1997) § 53a-59.

The facts of the defendant's offenses were uncontested at his criminal trial. Additional evidence was presented on behalf of the defendant that, in the months before he committed these offenses, he was abusing alcohol while also undergoing treatment for obsessive compulsive disorder (OCD). The defendant also was taking large doses of antidepressant (Prozac) and anti-anxiety (Xanax) medications that he had been prescribed. The evidence further revealed that the defendant had an adverse reaction to the medications, and in combination with alcohol consumption, they caused the defendant to exhibit manic behavior of psychotic proportions and, ultimately, to commit the index offenses. Consequently, the court, *Arnold, J.*, found the defendant not guilty by reason of mental disease or

defect on February 24, 2000.[6] The court specifically noted that the defendant had voluntarily ingested the Prozac and Xanax in accordance with his prescriptions.

Following the court's judgment, the defendant was referred to the Department of Mental Health and Addiction Services for an evaluation pursuant to the terms of General Statutes § 17a-582.[7] See *State* v. *DeAngelo*, Superior Court, judicial district of Ansonia-Milford, Docket No. CR-97-010866-S (June 20, 2000). The 2000 evaluation report was signed by a psychiatrist, the Director of the Diagnostic Unit, and the Director of the Whiting Forensic Division of Connecticut Valley Hospital (Whiting). The report stated that the defendant suffered from a serious psychiatric illness. The report also determined that the treatment of the defendant with Prozac and Xanax, combined with his use of alcohol, resulted in a manic like episode culminating in the

---

[6] General Statutes § 53a-13 (a) provides that, "[i]n any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time the defendant committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law." See also *State* v. *Long*, 268 Conn. 508, 540, 847 A.2d 862 (verdict of not guilty by reason of mental disease or defect establishes that person committed act that constitutes criminal offense because of mental illness), cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004).

Additionally, we note that, "[a]lthough § 53a-13 has been amended since the events giving rise to the acquittee's prosecution . . . that amendment has no bearing on this appeal. Accordingly, we refer to the current revision of the statute." (Citation omitted; internal quotation marks omitted.) *State* v. *Torell*, supra, 223 Conn. App. 24 n.2.

[7] "When an individual is found not guilty by reason of mental disease or defect, the individual—the acquittee—is committed to the custody of the Commissioner of Mental Health and Addiction Services for examination of the acquittee's mental condition. General Statutes § 17a-582 (a). Once the examination is complete, a hearing is held, and the court determines whether the examinee should be confined, conditionally released, or discharged. General Statutes § 17a-582 (e) (1) and (2). . . . *State* v. *Vasquez*, 194 Conn. App. 831, 835–36, 222 A.3d 1018 (2019), cert. denied, 334 Conn. 922, 223 A.3d 61 (2020)." (Internal quotation marks omitted.) *State* v. *Torell*, supra, 223 Conn. App. 24 n.5.

commission of the index offenses. The report concluded that the defendant was a danger to himself and to others and recommended his commitment to the jurisdiction of the board for a period of time as deemed appropriate by the court.

On June 19, 2000, the court held a commitment hearing. The court considered the testimony of the numerous mental health professionals and other witnesses, as well as several exhibits that were admitted into evidence, including the evaluation prepared in accordance with § 17a-582, and found that "the [defendant] presently constitutes a danger to himself and others." The court issued a memorandum of decision in which it detailed its findings and conclusions, ultimately committing the defendant to the jurisdiction of the board and ordering that he be confined at Whiting for a maximum confinement period of ten years.[8] The initial commitment was set to expire on or about June 18, 2010. By agreement of the parties, the defendant's commitment date has been extended multiple times.

On December 7, 2022, the state filed the petition for continued commitment pursuant to General Statutes § 17a-593 (c) that is the subject of this appeal. It alleged that the defendant "still remains mentally ill to the extent that his discharge would constitute a danger to himself or others." Additionally, the state claimed that the complete record of the board supports its position

---

[8] "See General Statutes § 17a-582; *State* v. *Harris*, 277 Conn. 378, 382–83, 890 A.2d 559 (2006) (after acquittee has proven defense of mental disease or defect, he or she may be committed to jurisdiction of board for maximum term of commitment not to exceed maximum sentence that could have been imposed had that individual been convicted); *State* v. *Foster*, 217 Conn. App. 476, 506 n.1, 289 A.3d 191 (*Seeley, J.*, concurring) (same), cert. granted, 346 Conn. 920, 291 A.3d 1041 (2023); see generally *State* v. *Long*, 268 Conn. 508, 519–20, 847 A.2d 862 (review of statutory commitment scheme for acquittees as set forth in General Statutes §§ 17a-580 through 17a-603), cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004)." *State* v. *Torell*, supra, 223 Conn. App. 25 n.6.

that there is reasonable cause to believe that a continued commitment is in the best interests of the protection of society. On February 3, 2023, the board filed its report in support of the state's petition and recommended that the court extend the defendant's commitment for an additional five year period.[9]

On August 16, 2023, the defendant filed a memorandum of law arguing that the court should deny the state's petition. The defendant conceded that he is a person with a mental illness;[10] however, he argued that "there is nothing to suggest that he is presently dangerous to himself or others." The defendant further noted that the board recently had approved his application for temporary leave, which it would not have been authorized to do if he constituted a danger to himself or others. See General Statutes § 17a-587 (a).[11]

The court, *Hall, J.*, conducted a hearing on August 30 and September 11, 2023. At the conclusion of this

[9] General Statutes § 17a-593 (d) provides: "The court shall forward any application for discharge received from the acquittee and any petition for continued commitment of the acquittee to the board. The board shall, within ninety days of its receipt of the application or petition, file a report with the court, and send a copy thereof to the state's attorney and counsel for the acquittee, setting forth its findings and conclusions as to whether the acquittee is a person who should be discharged. The board may hold a hearing or take other action appropriate to assist it in preparing its report."

[10] The board's report stated the following: "[The defendant's] psychiatric diagnoses are Bipolar I Disorder in Full Remission, Most Recent Episode Depressed—Moderate with Anxious Distress with Atypical Features; [OCD]; Other Specified Personality Disorder with Mixed Antisocial, Borderline and Narcissistic Features; Alcohol Use Disorder in Sustained Remission in a Controlled Environment and Tobacco Use Disorder in Sustained Remission in a Controlled Environment." He is currently prescribed various psychotropic medications. There does not appear to be any dispute that, due to his current mental illness, the acquittee suffers from a psychiatric disability. See, e.g., *State* v. *March*, 265 Conn. 697, 705–709, 830 A.2d 212 (2003).

[11] General Statutes § 17a-587 (a) provides in relevant part: "The board shall grant the application [for temporary leave], subject to such conditions and supervision as the board may set in the order for temporary leave, if it concludes that the acquittee's temporary leave, under the conditions specified, would not constitute a danger to the acquittee or others. . . ."

proceeding, the court issued an oral decision granting the state's petition. At the outset, it observed that the state had the burden of establishing, by clear and convincing evidence, that the defendant "has a psychiatric disability which leads him to pose an imminent danger to himself and to others and the court must also determine whether or not that's the case and also the effect of a granting or denial of the position on the [defendant's] own health and well-being, to a lesser extent."[12] The court then focused on the information contained in the board's September 5, 2023 report detailing the defendant's three previous temporary leaves, in which he "did well in many respects but was recalled to the care provider for various reasons" including alcohol use and an arrest for a minor theft. It also explained that, although the defendant had been approved for a phase one temporary leave,[13] albeit with extensive conditions, the board had not approved him for a phase two temporary leave or a conditional release. Finally, the court noted its concern about the effect that not having "direct institutional support" might have on the defendant's health and well-being. For these reasons, the court granted the state's petition, finding that it had met its burden of establishing by clear and convincing evidence that the defendant posed an imminent danger to the safety of himself and the community.

The next day, the court issued a written "supplement" for the purpose of emphasizing the rationale set forth

---

[12] General Statutes § 17a-593 (g) provides: "The court shall make a finding as to the mental condition of the acquittee and, *considering that its primary concern is the protection of society and its secondary concern is the safety and well-being of the acquittee*, make one of the following orders: (1) If the court finds that the acquittee is not a person who should be discharged, the court shall order the recommendation or application for discharge be dismissed; or (2) if the court finds that the acquittee is a person who should be discharged, the court shall order the acquittee discharged from custody. The court shall send a copy of such finding and order to the board." (Emphasis added.)

[13] See footnote 14 of this opinion.

in its oral decision. It noted that the state had presented testimony from Paul Bryant, a psychiatrist. The defendant called two psychologists, Drs. Brian Conover and Claudia Krasnicki, to testify on his behalf. "All three agreed that the defendant has done well, has been a thoughtful and cooperative patient, and has engaged in his treatment. The testimony of all three witnesses was supplemented by a series of reports prepared for the board and/or the court . . . ."

The court further explained: "The witnesses appear to have agreed . . . that, as currently managed under board supervision, the defendant does not pose such a danger to the community that he should not be granted a temporary leave from direct institutional supervision and care as part of a gradual reintroduction to unsupervised treatment. Where the witnesses diverged was on the issue of whether the defendant would pose a danger to himself or others in the absence of his current management and support regimen under the supervision of the board. Doctors Conover and Krasnicki testified that, if discharged, the defendant would have available to him the virtual equivalent of care and support he enjoys now. They also expressed confidence that the defendant would voluntarily avail himself of all that care and support. Doctor Bryant testified that the defendant would pose no danger to himself or others under his current management and support regimen." (Emphasis omitted.)

The court iterated that the defendant had been approved for temporary leave on three prior occasions, in 2002, 2004 and 2011, but such leaves had been canceled by Whiting due to rule violations and arrest. Finally, the court appeared to opine that a "gradual shift" from the board's management and supervision to the defendant having full responsibility of his treatment and living situation, the "generally preferred model,"

supported its decision to grant the petition. This appeal followed. Additional facts will be set forth as needed.

The following legal principles guide our review of this appeal. Our appellate courts have recognized that, despite the significant differences in the purposes between an order of commitment issued as a result of an acquittal pursuant to § 53a-13 and a prison sentence imposed as a result of a criminal conviction, the effect of such a commitment is no less a deprivation of liberty. See *State* v. *Imperiale*, 337 Conn. 694, 712–13, 255 A.3d 825 (2021); *State* v. *Torell*, supra, 223 Conn. App. 25 n.6. Our Supreme Court expressly has stated that the statutory procedures for the recommitment of acquittees, as set forth in § 17a-593 (c), implicate the liberty interests of such individuals. *State* v. *Long*, 301 Conn. 216, 238, 19 A.3d 1242, cert. denied, 565 U.S. 1084, 132 S. Ct. 827, 181 L. Ed. 2d 535 (2011); *State* v. *Long*, 268 Conn. 508, 524, 847 A.2d 862, cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004).

In *Payne* v. *Fairfield Hills Hospital*, 215 Conn. 675, 578 A.2d 1025 (1990), our Supreme Court explained: "[T]he confinement of insanity acquittees, although resulting initially from an adjudication in the criminal justice system, is not punishment for a crime. The purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and society from his potential dangerousness. *The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous. . . . As he was not convicted, he may not be punished. His confinement rests on his continuing illness and dangerousness. Jones* v. *United States*, 463 U.S. 354, 368–69, 103 S. Ct. 3043, 77 L. Ed. 2d 694 (1983)." (Emphasis added; internal quotation marks omitted.) *Payne* v. *Fairfield Hills Hospital*, supra, 683–84; see also *State* v. *Harris*, 277 Conn. 378, 394, 890 A.2d 559 (2006); *State* v. *Ardizzone*, 215 Conn.

App. 854, 866, 283 A.3d 982 (2022), cert. denied, 346 Conn. 905, 287 A.3d 1089 (2023).

In the present case, the state sought to extend the defendant's commitment pursuant to § 17a-593 (c), which authorizes the state to seek the continuing confinement of an acquittee beyond his maximum term of commitment. Our review of the defendant's claim, therefore, is based on the text of this statute, and judicial opinions that have interpreted it. We begin with the language of § 17a-593 (c), which provides: "If reasonable cause exists to believe that the acquittee remains a person with psychiatric disabilities or a person with intellectual disability to the extent that his discharge at the expiration of his maximum term of commitment would constitute a danger to himself or others, the state's attorney, at least one hundred thirty-five days prior to such expiration, may petition the court for an order of continued commitment of the acquittee."

In *State* v. *Metz*, 230 Conn. 400, 645 A.2d 965 (1994), our Supreme Court addressed the question of whether the state or the acquittee should bear the burden of proof regarding the basis for a continuing commitment beyond its original term. Id., 402. Speaking for a unanimous court, former Chief Justice Peters first discussed the significant constitutional issues implicated, generally, by confinement and, specifically, the due process entitlements of an acquittee whom the state seeks to confine beyond the terms of an original commitment. Id., 412–18. Former Chief Justice Peters stated: "These constitutional concerns lead us to construe the maximum period of commitment authorized by § 17a-582 (e) (1) (A) as a reasonably identified point of demarcation beyond which the presumption of dangerousness initially accompanying an acquittee does not continue. Accordingly, we conclude that § 17a-593 (c) impliedly imposes the same burden on the state at a hearing for

the continued commitment of an acquittee beyond his current definite period of commitment as is imposed in a civil commitment hearing under [General Statutes] § 17a-498 (c); namely, to show by clear and convincing evidence that the acquittee is currently mentally ill and dangerous to himself or herself or others or gravely disabled." (Footnote omitted.) Id., 425.

Subsequently, in *State* v. *March*, 265 Conn. 697, 830 A.2d 212 (2003), our Supreme Court noted that the term "dangerousness" as used in General Statutes § 17a-580 (5), includes the notion of immediacy. Id., 708–709. Thus, "dangerousness" incorporates the notion *that one poses an imminent risk of danger to oneself or to others*. Id. The state, therefore, must prove that an acquittee presents an imminent risk of "danger to self or to others" to meet its burden of proving an acquittee's dangerousness. (Internal quotation marks omitted.) Id., 709. In *State* v. *Harris*, supra, 277 Conn. 378, a matter in which the state sought to extend an acquittee's period of confinement, our Supreme Court iterated that the element of "dangerousness" in this context includes an imminent risk that the acquittee would harm himself or herself or others; id., 388; and explained further that the term " '[i]mminent' is defined as 'ready to take place; esp: hanging threateningly over one's head. . . .' Merriam–Webster's Collegiate Dictionary (10th Ed. 1993) [p. 580]." Id., 389. In sum, to satisfy its burden before the trial court in this matter, the state was obligated to prove by clear and convincing evidence that, as a result of his mental illness, the defendant posed a risk of imminent physical injury to himself or others. See *State* v. *Warren*, 100 Conn. App. 407, 416–17, 919 A.2d 465 (2007); Regs., Conn. State Agencies § 17a-581-2 (a) (6).

We recognize that a trial court that must make a determination of dangerousness in this context faces a difficult task. Additionally, we are cognizant that "the goals of a treating psychiatrist frequently conflict with

the goals of the criminal justice system. . . . While the psychiatrist must be concerned primarily with therapeutic goals, the court must give priority to the public safety ramifications of releasing from confinement an individual who has already shown a propensity for violence. As a result, the determination of dangerousness in the context of a mental status hearing reflects a societal rather than a medical judgment, in which the rights and needs of the [acquittee] must be balanced against the security interests of society. . . . The awesome task of weighing these two interests and arriving at a decision concerning release rests finally with the trial court." (Internal quotation marks omitted.) *State* v. *Corr*, 87 Conn. App. 717, 725, 867 A.2d 124, cert. denied, 273 Conn. 929, 873 A.2d 998 (2005); see also *State* v. *Warren*, supra, 100 Conn. App. 433 (although medical testimony may be helpful, issue of evaluating dangerousness and prediction of acquittee's future behavior, for which there is no bright-line test, is reserved for courts). Additionally, we note that, in addressing the legal determination of dangerousness in this context, "the court may and should consider the entire record available to it, including the defendant's history of mental illness, his present and past diagnoses, his past violent behavior, the nature of the offense for which he was prosecuted, the need for continued medication and therapy, and the prospects for supervision if released." (Internal quotation marks omitted.) *State* v. *Damone*, 148 Conn. App. 137, 171, 83 A.3d 1227, cert. denied, 311 Conn. 936, 88 A.3d 550 (2014); see also *State* v. *Jacob*, 69 Conn. App. 666, 677, 798 A.2d 974 (2002).

We turn now to our standard of review. As we have noted, in the case at hand, the state had the burden to prove by clear and convincing evidence that the defendant presents a risk of imminent danger to himself or to others due to his mental illness. The defendant has not challenged the court's finding that he suffers

from a mental illness; therefore, we are concerned solely with the issue of whether the state met its burden of proving that the defendant would constitute an imminent danger to himself or others if discharged from the jurisdiction of the board. As an appellate court, we do not find facts and we do not disturb the factual findings made by the trial judge unless they are clearly erroneous. See *State* v. *Ryder*, 111 Conn. App. 271, 276, 958 A.2d 797 (2008). As we have often stated, "[a] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Whelan* v. *Brestelli*, 230 Conn. App. 683, 696, 331 A.3d 1220 (2025); see also *State* v. *Orr*, 199 Conn. App. 427, 436–37, 237 A.3d 15 (2020).

Finally, we briefly discuss the clear and convincing evidence standard. As our Supreme Court noted in *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 700 A.2d 1108 (1997), a factual innocence case, this "standard should operate as a weighty caution upon . . . all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory." (Internal quotation marks omitted.) Id., 795. This court has explained that "[t]he clear and convincing standard of proof is substantially greater than the usual civil standard of a preponderance of the evidence, but less than the highest legal standard of proof beyond a reasonable doubt. *It is sustained if the evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist.* . . . Although we have characterized this standard of proof as a middle tier standard . . . and as an intermediate standard . . . between the ordinary civil standard of

a preponderance of the evidence, or more probably than not, and the criminal standard of proof beyond a reasonable doubt, *this characterization does not mean that the clear and convincing standard is necessarily to be understood as lying equidistant between the two. Its emphasis on the high probability and the substantial greatness of the probability of the truth of the facts asserted indicates that it is a very demanding standard and should be understood as such.*" (Citations omitted; emphasis altered; internal quotation marks omitted.) *In re Giovanni C.*, 120 Conn. App. 277, 279–80, 991 A.2d 638 (2010); see also *State* v. *Rizzo*, 266 Conn. 171, 211 n.22, 833 A.2d 363 (2003) (intermediate standard is used when particularly important individual rights are involved). Guided by these principles, we now turn to the evidence produced at the hearing and the court's findings regarding the state's petition for continued commitment.

As indicated in the board's report to the court dated January 30, 2023, which was admitted into evidence as exhibit 1 at the hearing, following his commitment in 2000, the defendant initially was confined in a maximum security setting at Whiting. Shortly thereafter, the board transferred him to Dutcher Services (Dutcher), which is a less restrictive setting, at Whiting.

During the defendant's periods of confinement, he has been granted temporary leaves[14] for specific periods

[14] Bryant testified that a temporary leave is "the process in which the hospital believes that one of their acquittees is ready for transition to the community . . . . The first phase is called day temporary leaves, where the acquittees leave the hospital and go into the community just to spend the day. That usually starts off with about one day a week, and then progresses to a few days a week, but they always come back to the hospital and spend the night.

"And, then, once someone has successfully done well on that for a period of time, they then go to a phase two, or overnight temporary leave where they will spend the night in the community. So, again, they'll—it'll be progressive where they'll start with one day and then that will increase up to seven days a week where they're essentially staying in the community except for a weekly trip back to the hospital to check in with their treatment team."

of time. One such leave that had been granted in 2002 was terminated after the defendant was arrested for shoplifting in 2004. Another leave that was granted in 2007 was terminated one year later, when the defendant attempted suicide. He began a third period of leave in 2011, which continued for three years, during which time the defendant exhibited clinical stability. On the basis of that success, the defendant was granted a conditional release[15] which allowed him to live outside of Whiting full time and receive outpatient treatment at the Connecticut Mental Health Center. But this period of quietude ended in 2015, when the board learned that, in spite of receiving therapeutic and community support, the defendant secretly had been consuming alcohol.[16] He then was transferred, without objection, back to Whiting.

In 2020, the defendant experienced profound depressive symptoms and underwent electroconvulsive therapy. Subsequently, the defendant began showing significant improvement in self-care and participation in treatment activities. Additionally, his anxiety and OCD symptoms improved. Consequently, Whiting granted the defendant the highest level of privileges, which allowed him access to the Whiting's grounds without supervision.

During the three year time period between February, 2020, and January, 2023, and specifically in 2020 and 2021, the defendant encountered a series of stressful events, including a severe episode of COVID-19 that necessitated treatment in the intensive care unit, a burst

---

[15] Bryant described a conditional release as follows: "[T]he hospital is saying . . . this person is really being treated in the community, they're doing well so we think that their treatment should move to the community treatment team."

[16] Bryant testified that the defendant would become more anxious and overwhelmed as a commitment hearing approached, and, rather than alert his treatment providers to his increased symptoms, would consume alcohol as a coping mechanism.

appendix that required surgical intervention, and the death of his mother, who was his primary support. Nevertheless, despite these traumatic events and the attendant pressure on him, the board reported that the defendant utilized his treatment team for support and avoided any further depressive episodes. The defendant's providers monitored his increased anxiety symptoms, which did subside as he continued to participate in individual and group therapy.

The state also introduced a letter from Whiting to the board dated June 15, 2023, that was admitted into evidence at the hearing as exhibit 3, stating that an application for temporary leave had been made on the defendant's behalf. This application had not been acted upon when the state filed its petition to extend the defendant's commitment. In response to the application for temporary leave, the board issued a memorandum of decision dated September 5, 2023, which was admitted at the hearing on the state's petition, designated as exhibit 4. In this decision, the board noted that the defendant "has consistently collaborated with hospital and community staff with the goals of appropriately engaging in available treatments and working towards a place where he's ready to begin a [t]emporary [l]eave once again." The board further observed that the defendant "has maintained a full privilege level that allowed him to have unsupervised pass times on hospital grounds within his own custody for much of the day. [The defendant] also went on several hospital supervised trips into the community and there were no associated concerns with him." Although the board found that the defendant had, in more recent years, gained considerable insight into his behaviors and needs, and had been fully engaged in all available therapies and medicines, only phase one of the hospital's application for temporary leave was approved. In granting only phase one of the application allowing the defendant

day leaves from the hospital, but denying phase two, which would have permitted overnights away from the hospital, the board opined: "Due to the level of risk that [the defendant] has presented both to himself and to the community during previous attempts for community reintegration, the [b]oard wants to ensure that [the defendant] is appropriately supported and that decisions are clinically validated and supported related to his transition period, identified services and timeframes. Therefore, the [b]oard finds that under the conditions contained within this order . . . [the defendant] would not constitute a danger to himself, or others should he start to participate in treatment in the community."

During the hearing on its petition, the state offered the testimony of Bryant, who identified himself as an employee of Yale University and a consulting forensic psychiatrist for the Department of Mental Health and Addiction Services. Bryant testified concerning the defendant's treatment and medication regime. As to the defendant's diagnoses, Bryant testified that he suffers from bipolar disorder, OCD, personality disorder with antisocial, borderline, and narcissistic traits, as well as alcohol and tobacco abuse disorders in sustained remission. Bryant offered his opinion that all of these diagnoses and their symptoms are well managed under the defendant's treatment regime, including the current medicines administered to him. He opined that, if the defendant were to discontinue receiving the doses of medicine prescribed for him, there would be a risk that his symptoms would reemerge, including depressive or manic behaviors. Notably, Bryant concluded that, in his current circumstances in the hospital and under the jurisdiction of the board, the defendant does not present a substantial risk of danger to himself or any others. Prescriptively, Bryant opined that a gradual reintroduction into the community would best suit the defendant's

needs. Significantly, he did not say that the defendant posed an imminent danger to himself or to others. Bryant acknowledged that the defendant had not engaged in any threatening behavior, violence or aggression. His testimony was couched in terms of risks of an increase in the defendant's symptoms should the defendant stop taking the medicines prescribed for him and cease his treatment. However, Bryant offered no testimony regarding the risk of *imminent* danger to the defendant or others if the defendant were to be released from the jurisdiction of the board. Indeed, on cross-examination, Bryant acknowledged that he had supported the application filed on behalf of the defendant for a gradual, two step temporary leave program that would initially result in day passes and eventually, in phase two, grant him the opportunity for overnight stays away from Whiting. He then was asked this question: "If [the defendant] currently posed an immediate risk of harming himself or others, Whiting . . . would not be asking the [board] to grant a [temporary leave] application. Is that correct?" Bryant answered: "Yes, I'd say that's correct." Further, on cross-examination, Bryant repeated his opinion that the defendant is not a danger to himself or to others with "his symptoms managed in the current way." Finally, in response to a question from the defendant's lawyer, Bryant acknowledged his belief that the defendant did not meet the criteria for civil commitment at that time.

Following Bryant's testimony, the state rested. The defendant then called Conover as his first witness. Conover is a clinical psychologist employed by Whiting. He testified that he has served as the defendant's individual psychotherapist for approximately eight years. After discussing the defendant's progress over the past several years following his return to Whiting in 2015, Conover stated his belief that the defendant no longer needed to be under the supervision of the board. As

reasons for this opinion, Conover noted the defendant's investment in his treatment, as well as his willingness to collaborate with his treatment team. Conover concluded by opining that, once free of board supervision, the defendant would continue with his treatment on a voluntary basis.

Much of the state's questions during its cross-examination of Conover concerned the hospital's temporary leave program, which the board just had approved partially for the defendant with the result that, once implemented, he would have the opportunity to leave the hospital during the daytime and to return in the evening. Conover acknowledged that, generally, such a gradual process is useful for individuals who have been confined to the jurisdiction of the board. When asked if the temporary leave process that transitions into community release would be beneficial to the defendant, Conover answered that, in these particular circumstances, a gradual release into the community would not benefit the defendant. Conover expressed, as the basis of this conclusion, that, over time, the defendant has gained insights into his illness. He commented that the defendant "has demonstrated not only his ability to identify those symptoms, but to respond to any kind of increase in symptoms by reaching out to his treaters and asking for help with those things, and, therefore, the compulsory nature is not really necessary, and I would say the same about his substance abuse." Conover stated, as well, that the defendant is motivated to remain sober and remain totally compliant with his treatment plan for continued sobriety. Conover added that the level of oversight the board presents in the defendant's situation is a stressor for him, and this additional stress constituted a risk factor. Conover concluded by stating his belief that the defendant should be discharged from any further confinement without the need for a gradual release as envisioned by the board.

The second witness called on behalf of the defendant was Krasnicki, a psychologist serving at Dutcher, where the defendant is housed. She testified that she had worked with the defendant for approximately twelve years. On the basis of her extensive experience directly with the defendant, she opined that he is not presently a danger to himself or to the community. During cross-examination, when asked about the defendant's sobriety, she pointed out that both liquor and other drugs can be obtained by those confined to Whiting but that the defendant has been committed to his sobriety and the treatment necessary to remain alcohol free. Krasnicki also commented that the defendant has the strong support of a brother and a sister who is like a second mother to him and that, over time, he has developed a personal relationship with his treaters at the hospital, whom she said she believed the defendant would continue to see even if he were no longer under the board's control.

Our review of the trial testimony reveals that none of the mental health professionals testified that he is presently a danger to himself or to others. Bryant did opine that, if the defendant ceased his treatment medication regimes, "there would be risk for exacerbation of his bipolar disorder which could include depressive symptoms or manic symptoms, could cycle between the two. There would . . . we'd anticipate an increase in OCD symptoms, which had been very severe in the past for . . . [the defendant]. And he would also be at an increased risk for relapse into his alcohol use disorder." This testimony, however, did not include an opinion as to whether such increased risks were imminent, or whether there was an imminent, increased risk that the defendant might cease his treatment or medication if he were to be released from the jurisdiction of the board. Further, there was no testimony regarding an imminent risk of danger of physical harm to either

the defendant or others. Finally, both of the defendant's treating psychologists opined that the ongoing stress of being under the jurisdiction of the board actually was having detrimental impact on the defendant's well-being.

On the basis of this record, the question before us is whether the court's determination that the state met its burden of demonstrating, by clear and convincing evidence, that, as a result of his mental illness, the defendant posed a risk of imminent physical injury to himself or others was clearly erroneous. We conclude that the state failed to present the necessary evidence of an *imminent* risk of physical harm to the defendant or others and, therefore, the court's finding was improper.

To be sure, the record reflects that, during the defendant's commitment, he has been granted several temporary leaves from Whiting, and, while on these leaves, he has participated in misconduct that had caused him to return to a stricter form of confinement at Whiting. As previously stated, the defendant's first temporary leave began in 2002, but was terminated in 2004 after his arrest for shoplifting. His second temporary leave began in 2007, but was terminated in 2008, after he had attempted suicide and violated other terms of his temporary leave. His third temporary leave began in 2011 and, as acknowledged by the state, for the following three years of this leave, the defendant exhibited clinical stability and treatment compliance. Thereafter, in 2014, the defendant was granted a conditional release, which allowed him to live full-time outside of Whiting and to receive treatment at the Connecticut Mental Health Center. This conditional release was terminated, however, in 2015, when the board discovered that the defendant had been consuming alcohol. It is notable, however, that, in each of these situations, none of the

defendant's missteps occurred shortly after the commencement of either the temporary leave or the conditional release. In short, nothing in the history of these failures suggests that, if freed from the jurisdiction of the board, there is an *imminent* risk that the defendant may become a danger to himself or others.

To the contrary, his current treatment providers testified that, in the years since his last conditional release, the defendant has continued to mature and more fully embrace his treatment regimens. Additionally, he now receives two medications, disulfiram, commonly known as Antabuse, and naltrexone, which dampen cravings for alcohol consumption, and he is a willing participant in the various therapies provided to him that will remain available to him even after his discharge from confinement. The trial court heard no evidence that the defendant would discontinue either his treatment or medications if released from the jurisdiction of the board and, as a result, present an imminent risk of danger to himself or others.[17]

As noted, at the hearing before the trial court, Conover, who has treated the defendant for several years, testified to his belief that the defendant does not presently need a period of gradual transition back into the community on the basis of his commitment to his treatment regime. And Krasnicki, a clinical psychologist who has treated the defendant for twelve years, testified in favor of his complete release from the jurisdiction of the board. In addition to her belief that the defendant does not need a gradual period of transition before

---

[17] Bryant did testify that, if the defendant was to stop taking all of his medications, there would be a risk of an increase of his bipolar disorder, including depressive or manic symptoms, an increase in his OCD symptoms, and increase for a relapse of his alcohol use disorder. His testimony, however, did not address the likelihood of the defendant ceasing to take all of his prescribed medications and a corresponding increased risk in his dangerousness.

becoming free of the board's oversight, Krasnicki opined that the ongoing oversight is not in the defendant's best interest and could actually be detrimental to him. She opined: "He, at this point in time, I feel is strongly committed to his treatment, his recovery. I don't feel that having that layer of oversight at this point is doing anything more but adding more stress which is not added to his quality of life."

In its oral decision, the trial court referred to exhibit 4, the board's September 5, 2023 memorandum of decision with respect to the defendant's application for temporary leave. The court used this document as a basis to summarize the defendant's prior temporary leaves that had been terminated for various reasons. The court then specifically noted that, in approving the phase one temporary leave, the board concluded the defendant would not constitute a danger to himself or others if he continued to participate in treatment. The court further explained that the board had observed that the defendant remained a person with a psychiatric disability to the extent that his discharge or conditional release would constitute a danger to himself or others without the conditions imposed as a part of the phase one temporary leave. The board's memorandum of decision, however, contained no evidence that the defendant would pose an *imminent* risk of danger to himself or others if he were granted a phase two temporary leave. Rather, this document set forth the conclusory statement that, "[d]ue to the level of risk that [the defendant] has presented both to himself and to the community during previous attempts for community reintegration, the [b]oard wants to ensure that [the defendant] is appropriately supported and that decisions are clinically validated and supported related to his transition period, identified services and timeframes." This statement, while perhaps sufficient to deny an application for a phase two temporary leave, lacks the necessary

detail to support a finding of dangerousness required to grant a petition to extend a commitment beyond its maximum term. Significantly, the board's memorandum of decision provided no support for its conclusion that the defendant posed an imminent danger to himself or others should he be released from the board's jurisdiction.

Next, the court expressed its concern regarding the effect on the defendant's health and well-being should he no longer have the direct institutional support of the board, noting the substantial amount of time that he had been under its jurisdiction. While this may have been a legitimate concern, particularly for his treatment providers, the court did not cite to or refer specifically to any evidence that a change in the defendant's circumstances would result in his imminent dangerousness. Again, the question is not whether a particular course of treatment would be a "better" medical approach for the defendant, but whether the defendant, if released from the board's jurisdiction, posed a risked of imminent physical injury to himself or others due to his mental illness. See *State* v. *Warren*, supra, 100 Conn. App. 416–17.

In the September 12, 2023 written supplement to the oral decision, the court remarked that the witnesses at the hearing on the state's petition diverged on the issue of whether the defendant would pose a danger to himself or others. It further acknowledged that all three professionals "expressed confidence" that the defendant would continue to avail himself, on a voluntary basis, of the care and support he received while under the jurisdiction of the board. After citing to the board's September 5, 2023 memorandum of decision addressing the application for a temporary leave, the court explained that, given the preference for a gradual shift from the oversight of the board to the defendant's having full responsibility for his treatment, its view was that the

defendant should remain under the jurisdiction of the board while this gradual shift occurred. It again failed to connect this reasoning with the requirement that the state establish an imminent danger to the defendant or others. Simply stated, in both its oral remarks at the September 11, 2023 hearing and in the written supplement to its oral decision, the court relied on no evidence regarding the imminent dangerousness element required under our law.

To illustrate the lack of evidence of imminent dangerousness in this matter, it is useful to compare and contrast this defendant with other acquittees with similar procedural histories. In *State* v. *Foster*, 217 Conn. App. 476, 289 A.3d 191, cert. granted, 346 Conn. 920, 291 A.3d 1041 (2023), this court affirmed the judgment of the trial court granting the state's petition to extend the confinement of an acquittee who had been found not guilty by reason of mental disease or defect. Id., 478. The underlying facts of that case, as recited by this court, are instructive. "On January 16, 2001, [Franklin Foster], then twenty-four years old, entered a Greenwich middle school while in possession of two knives. In a school hallway, [Foster] slapped, punched, and kicked a male sixth grade student, and he lifted a female sixth grade student over his head. [He] was on school grounds without permission and his violent conduct was unprovoked." Id., 478–79. After Foster was found not guilty by reason of mental disease or defect, and the appropriate referral for evaluation was made, the court committed him to the jurisdiction of the board for a period of time not to exceed ten years. Id., 479. His commitment was continued by agreement several times. Id. In 2018, he was granted a conditional release and began living in the community. Id. In 2019, the state filed a petition for continued commitment in which it alleged "that reasonable cause existed that [Foster]

continues to be a danger to himself or others if discharged from confinement and that without continued supervision by the board, [he] would quickly decompensate and become a risk." (Internal quotation marks omitted.) Id.

On appeal, Foster claimed that the state failed to present clear and convincing evidence that he was an imminent threat to become a danger to himself or others. Id., 482. The state, however, had adduced evidence that, during Foster's period of confinement, there had been "several instances in which he intimidated, inappropriately touched, and made socially inappropriate statements, often of a sexual nature, to female staff members." Id., 489. The trial court noted, as well, that reports of instances of inappropriate conduct continued up through the latest report that the board filed with the court. Id., 490.

This court further stated "that there was evidence before the [trial] court that, following [Foster's] commitment to the board, he used physical violence toward other patients, he challenged another patient to engage in a physical alteration, and he engaged in otherwise threatening behavior toward others." Id., 492. Furthermore, this court observed that there was evidence before the court of Foster's "noncompliance with prescribed medication in a hospital setting." (Internal quotation marks omitted.) Id. Finally, the trial court in *Foster* had explained that the board had stated that without mandated safeguards, "which [Foster's] treaters continue to believe are required to address his risk, he is likely to become noncompliant with treatment and medication . . . ." (Internal quotation marks omitted.) Id., 493.

These findings and this history can readily be contrasted with the facts in the present case, beginning with a comparison of the nature of the index offense

in the present case to the continuing violent conduct by Foster. To be sure, robbing the bank in 1997 was a dangerous activity, given the use of a pellet gun, the presence of a loaded shotgun in the defendant's car, and his brief attempt to elude capture. His conduct while under the jurisdiction of the board, however, is distinguishable from that found in other cases involving acquittees such as Foster. His misconduct while on leaves from confinement over the years did not include any violence or threat of violence on his part.[18] Additionally, Foster's history of noncompliance with his medicine regimen is in stark contrast to the unrefuted evidence that the defendant is not only medicine compliant but is eager to continue with all of his therapeutic treatments. In short, there was no evidence presented to the court that the defendant will "quickly decompensate" if released from the jurisdiction of the board. Id., 479.

The state also relies partially on this court's opinion in *State* v. *Dyous*, 198 Conn. App. 253, 233 A.3d 1138, cert. denied, 335 Conn. 948, 238 A.3d 17 (2020), another case in which the state sought to extend the commitment of an acquittee who had been found not guilty by reason of mental disease or defect after his criminal trial. Id., 254. Following the trial and the appropriate referral, the court committed Anthony Dyous to the jurisdiction of the board for a period not to exceed twenty-five years. Id. Dyous had been charged with two counts of kidnapping in the first degree, two counts of threatening in the second degree, and one count of

---

[18] The state relies heavily on our reasoning in *State* v. *Warren*, supra, 100 Conn. App. 407, that a record that does not reveal any acts of physical aggression does not preclude a finding of dangerousness. Id., 433. Although we agree with that proposition, it nonetheless remains the state's burden of proving *imminent* dangerousness to self or others by clear and convincing evidence in the context of a petition to continue commitment filed pursuant to § 17a-593 (c). In other words, our conclusion that the court improperly granted the state's petition is not based solely on the absence in the record of any action of physical aggression by the defendant.

carrying a dangerous weapon. Id. The underlying facts, as recited by our Supreme Court are as follows: "Between 1977 and the time of the incident [that] resulted in his criminal commitment [Dyous] was hospitalized three times in psychiatric facilities. Thereafter, in December, 1983, [Dyous] hijacked a bus carrying forty-seven people, including a child. He threatened the driver with a bomb and nerve gas and stated he had been asked by God to deliver a message." (Internal quotation marks omitted.) Id., 255.

This court noted that, in 1986, Dyous escaped from the Norwich State Hospital with a female peer with whom he travelled to South Carolina, Texas, and finally Mexico, where he was apprehended. Id. This court further observed that, when found in Mexico, Dyous exhibited symptoms of psychosis and that, once returned to Whiting, he "was found to be grossly psychotic and experiencing auditory and visual hallucinations as well as grandiose and persecutory delusions." Id. At Whiting, he was involved thereafter in a violent incident that resulted in his own injuries as well as injuries to staff members and other patients. Id.

This court, on review, also tracked Dyous' periods of confinement and partial releases in the following years, which included a positive drug screen for cocaine, symptoms of psychosis, and failure to adhere to his medicine regimen, including refusing to take his medications. Id. From time to time, he exhibited psychotic and paranoid symptoms, as well as delusional thinking. Id. Following his return to Whiting, he became violent and was at one time placed in four-point restraints for a period of six hours. Id. This court continued: "During the next several years, [Dyous] remained at Whiting and was involved in a series of assaults. From 1996 [through] 2005, [his] behavior at Whiting was characterized by chronic refusal to take medication, irritability, mood lability, grandiosity, paranoid ideation, rule

breaking, physical altercations with peers and refusal to engage meaningfully in treatment." Id., 256.

This court further noted that, "throughout his commitment, [Dyous] has demonstrated little insight into his illness and, instead, has sought to justify or rationalize his behavior. Additionally, despite a history of psychotic episodes, [Dyous] remains steadfast in his opposition to taking antipsychotic medication [even] [t]hough medication has been shown to ameliorate [his] symptoms . . . ." (Internal quotation marks omitted.) Id., 257–58.

The appeal in *Dyous* arose after the trial court had granted a 2017 petition by the state to further extend [Dyous'] period of confinement. Id., 260. On appeal, this court noted that, in granting the state's petition, the trial court took into consideration the seriousness of the criminal conduct, as well as Dyous' lack of participation in recommended treatment groups, poor insight into his mental illness and refusal to take recommended medication. Id. The trial court also referred to Dyous' altercation with another patient in which Dyous had acted in a confrontational and very aggressive manner. Id.

In our view, the state's reliance in the present case on *Dyous* is misplaced. There, the state presented, and the court found, ample evidence of Dyous' continuing dangerousness. In contrast, in the present case, there is no evidence of the defendant's present dangerousness to himself or others; there is only the concern expressed by the board and echoed by the court that the defendant may at some future point stop following his medicine regimen and may at some future point cease his therapies with the result that he might then act in a manner dangerous to himself or others. Although his index offenses were significant, and they created a risk of harm to others, they involved none of the violence that

characterized the behaviors described in either *State v. Foster*, supra, 217 Conn. App. 476, or *State* v. *Dyous*, supra, 198 Conn. App. 253. Similarly, the history of the defendant's confinements and periodic releases evinced no violent or antisocial behavior. Moreover, and importantly, while neither Foster nor Dyous demonstrated insight into their mental illnesses, the psychologists who have treated the defendant testified that he shows great insight into his mental health condition and demonstrates an unwavering commitment to his medicine and treatment regime. In short, the *Foster* and *Dyous* cases, both relied upon by the state, are of value only for the stark contrasts they present to the circumstances of the defendant before us.

Instead, we conclude that the present matter is more analogous to a recent decision from the Superior Court. In *State* v. *Ali*, Docket No. CR-04-108157-S, 2023 WL 4881439 (Conn. Super. July 3, 2023), the state filed a petition to continue the commitment of the acquittee pursuant to § 17a-593 (c). In 1983, the acquittee had set fire to a residence after he had been denied permission to join a card game with his mother and her friends. Id., *1. He was acquitted of arson in the second degree after the court found that "he lacked . . . substantial capacity because of mental disease or defect to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law." Id. He initially was committed to the jurisdiction of the board for twenty years, and that commitment was extended on several occasions. Id.

The court conducted a hearing on June 29, 2023, regarding the state's most recent petition to extend the acquittee's commitment. Id. Alexander Westphal, a psychiatrist, testified as the state's sole witness. Id. Westphal indicated that the acquittee, who had been granted the highest level of privileges available at the hospital, was found to be in his best mental state, and

there were no concerns that the acquittee posed a risk to himself or others. Id. In denying the state's petition, the trial court relied on Westphal's opinion that the acquittee presently did not meet the standard for a civil commitment, as well as concluding that a "risk couched in the terms of a possibility is simply too thin a reed to carry the weight of the state's burden under these circumstances." Id., *2. Ultimately, the court determined that the state had not met its burden and ordered that the acquittee was to be discharged from the custody of the board at the conclusion of his current period of commitment.[19] Id., *3.

Similarly, in the present case, Bryant testified that he did not have an opinion as to whether continued commitment would be beneficial to the defendant. Bryant further stated that, under the defendant's current treatment and management, he did not present an acute risk of danger to himself or others. Bryant agreed on cross-examination that, if the defendant presently posed a risk of danger to himself or others, the hospital would not have granted the application for a temporary leave. Bryant also acknowledged that the defendant, who also was granted the highest level of privileges on hospital grounds, presently did not meet the standard for a civil commitment. Finally, Bryant's testimony did not link or quantify, in any manner, the potential increased risks of symptoms that the defendant may experience to the risk of imminent physical injury to himself or others. Rather, his testimony, and the letter from the board recommending that the defendant's commitment be extended for another five year period, suggest that the state's motion should be granted because there has not yet been a successful gradual transition period from

---

[19] Although *Ali*, as a trial court opinion, is not binding on this court, we find that the court's reasoning that a mere possibility of a risk of dangerousness is insufficient to justify the continued commitment of an acquittee in these circumstances is applicable to the matter at hand.

the hospital to the community. As previously noted, although this certainly may be a laudable and prudent therapeutic approach, it falls short of the demanding standard that the state must meet under these particular circumstances and to ensure that the defendant's due process rights are protected. We iterate that, in order to extend the defendant's commitment, the state was required to prove, by clear and convincing evidence, that his discharge would constitute an imminent danger to himself or others. See *State* v. *Torell*, supra, 223 Conn. App. 40.

The trial court appears to have been concerned primarily with an abrupt transition from the "direct institutional support provided under the auspices of the [board]" and the defendant's extensive involvement with that entity to his being on his own in the community. There was no evidence in the record, however, that the defendant would move from the hospital to an unsupported community setting. To the contrary, the defendant's psychologists testified that he indicated he would continue his treatment with the hospital with minimal changes, despite no longer being under the jurisdiction of the board. We recognize that the trial court was not required to accept this testimony, and we are not at liberty to substitute our views of this evidence in place of the trial court. Despite our limited review, however, we conclude that absent from the court's analysis is a finding, based on clear and convincing evidence, that such a rapid transition would result in a risk of imminent harm to himself or others. The court's reference to an unsupported and conclusory statement reciting the appropriate legal standard from the board's report does not constitute evidence to meet the rigorous standard applicable under these facts and circumstances.

In *State* v. *Metz*, supra, 230 Conn. 400, the former chief justice stated the following: "Freedom from unjustified

governmental intrusions into personal security and bodily freedom are basic, historically recognized liberty interests that are protected by the federal constitution. *Foucha* v. *Louisiana*, 504 U.S. 71, [79–80], 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992); *Vitek* v. *Jones*, 445 U.S. 480, 492, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980). As a matter of federal law, [i]t is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection; that is, the nature of commitment [must] bear some reasonable relation to the purpose for which the individual is committed. *Foucha* v. *Louisiana*, supra, [79]. The United States Supreme Court has recognized involuntary commitment to a mental institution, in particular, as involving more than a loss of freedom from confinement; *Vitek* v. *Jones*, supra, [92]; due to its stigmatizing consequences, and the potential exposure to invasive, compulsory medical and psychiatric treatment. . . . The law of federal due process accordingly imposes significant constitutional constraints on involuntary commitments. Even for the purpose of psychiatric treatment, a state may not confine an individual, unless the individual is both mentally ill and dangerous. *O'Connor* v. *Donaldson*, 422 U.S. 563, 573–76, 95 S. Ct. 2486, 45 L. Ed. 2d 396 (1975)." (Citation omitted; internal quotation marks omitted.) *State* v. *Metz*, supra, 230 Conn. 412–13. It bears repeating that, although a gradual shift to the community from the hospital may be preferable for purposes of his treatment, the record and our mandated application of the pertinent law do not support the finding necessary to permit the state to extend further the deprivation of the defendant's liberty interest.

In the matter at hand, in which the defendant now has been confined for twenty-five years following the index offenses and fifteen years beyond the ten year period of maximum confinement initially imposed by the court, and in the absence of clear and convincing

evidence that he is presently an imminent danger to himself or to others, he is entitled to his freedom. Accordingly, we conclude that the state failed to meet the very demanding standard of clear and convincing evidence. This standard operates "as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory." (Internal quotation marks omitted.) *Antonio A.* v. *Commissioner of Correction*, 205 Conn. App. 46, 88, 256 A.3d 684, cert. denied, 339 Conn. 909, 261 A.3d 744 (2021). On the basis of the principles set forth herein, we conclude that state failed to meet its demanding burden. Therefore, the court improperly granted the petition to continue the defendant's commitment.

The judgment is reversed and the case is remanded with direction to deny the state's petition for continued commitment.

In this opinion the other judges concurred.